Judge RYAN
delivered the opinion of the Court.
In this case we are asked to decide whether the military judge abused her discretion when she denied the motion in limine to exclude testimony from an expert in child sexual abuse that was based in part on findings from a physical examination of the victim, findings which Appellant claims are unreliable. See Military Rule of Evidence (M.R.E.) 702; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); United States v. Billings, 61 M.J. 163, 166 (C.A.A.F.2005). We conclude that the military judge’s determination that the expert opinion had a sufficient factual basis and was reliable was not “ ‘manifestly erroneous.’ ” General Electric Co. v. Joiner, 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (quoting Spring Co. v. Edgar, 99 U.S. 645, 658, 25 L.Ed. 487 (1878)). Therefore, we hold that the military judge did not abuse her discretion.
I. Background
A.
A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of rape and forcible sodomy of his eight-year-old stepdaughter, JA, in violation of Articles 120 and 125, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 920, 925 (2000). The sentence adjudged by the court-martial and approved by the convening authority included a dishonorable discharge, confinement for nine years, forfeiture of all pay and allowances, and reduction to the lowest enlisted grade. The Court of Criminal Appeals affirmed. United States v. Sanchez, No. ARMY 20010943 (ACt.Crim.App. Apr. 12, 2006) (unpublished).
We granted review of the following issue:
WHETHER THE MILITARY JUDGE ABUSED HER DISCRETION BY ADMITTING EXPERT TESTIMONY REGARDING THE ALLEGED VICTIM’S MEDICAL EXAMINATION OVER DEFENSE OBJECTION.
B.
JA, Appellant’s eight-year-old stepdaughter, complained to her mother that Appellant sexually molested her over a period of more than two years. She presented details to her mother and to medical professionals regarding the instances of rape and forcible oral and anal sodomy of which Appellant was convicted.
In early January 2001, a few days after the last act of forcible anal sodomy, Ms. Lori Long, a forensic examiner and sexual assault nurse examiner at the Chrisus Santa Rosa Children’s Hospital, examined JA. Ms. Long concluded that JA’s vagina was abnormal, “concerning”[1] for abuse, and consistent with the history of sexual abuse she took from JA.
At the end of January 2001, Dr. Nancy Kellogg, the Medical Director of the Alamo Children’s Advocacy Center, reviewed Ms. Long’s conclusions and the patient history taken from JA by Ms. Long, interviewed JA, and conducted her own physical examination and medical evaluation of JA.
At trial, Appellant moved in limine to exclude the testimony of Dr. Kellogg, who was an expert witness for the prosecution, under M.R.E. 702 and Daubert. The defense accepted Dr. Kellogg as an expert in child sexual abuse and did not argue that expert testimony on child sexual abuse was irrelevant to the facts at issue in the case.[2] In *147 stead, the defense argued that the expert’s testimony was not the product of reliable methodology. Id.
The military judge conducted an Article 39(a), UCMJ, 10 U.S.C. § 839(a) (2000) hearing, to assess the reliability of this testimony. At the hearing, Dr. Kellogg explained the methodology she used in arriving at her opinion that JA was concerning for sexual abuse. Dr. Kellogg testified that she had conducted a physical examination of JA, taken fluid samples, conducted laboratory tests on those samples, reviewed JA’s medical history, consulted with a professional colleague, and spoken with JA, who made certain comments about the sexual abuse that implicated Appellant. Dr. Kellogg testified that it is standard practice in her field to look at all of these factors together: “the diagnosis in medicine is made on the basis of a constellation of findings.”
Dr. Kellogg explained why, using this methodology, she concluded that JA was concerning for sexual abuse. One of the most important factors was the consistent patient history. Relevant to the instant appeal are three specific medical findings from Dr. Kellogg’s physical examination of JA that she considered: (1) a thickened hymen; (2) a high vaginal white blood cell count; and (3) anal dilation. Dr. Kellogg elaborated on the significance of each of these findings as it related to her conclusion that JA was concerning for sexual abuse.
Dr. Kellogg testified that the hymenal tissue in a prepubertal child should be thin and sheet-like, not thickened. JA’s hymen had focal thickening. Moreover, the vaginal swabs revealed that JA had numerous white blood cells inside of her vagina.
These findings were concerning for sexual abuse because while the hymen does thicken over time due to estrogen as the child matures and sexual development occurs, focal thickening of the sort observed in JA, who was only eight, is not normal and is usually the result of trauma. Trauma includes both irritation and penetration, which are consistent with sexual abuse. Further, in light of JA’s prepubertal state of maturity, a high white blood cell count was unusual. It could be caused by either an infection or irritation. JA did not have an infection. A hymen that was torn or attenuated could account for the presence of white blood cells because the protective shield is less effective in shielding the vagina from bacteria. JA’s hymen did not cover her vaginal opening. The medical findings and patient history were the basis of Dr. Kellogg’s medical assessment that JA’s vagina was concerning for sexual abuse.
Dr. Kellogg next described her examination of JA’s anus while JA was in the knee/ chest position. There was no stool, and both the external and internal sphincters immediately dilated. Dr. Kellogg acknowledged that there were certain other circumstances where anal dilation might be considered normal. But because none of those circumstances existed, the anal dilation was concerning for sexual abuse. Dr. Kellogg admitted that reliance on anal dilation findings to support a conclusion of sexual abuse is relatively controversial in her field.
Dr. Kellogg further explained that her medical findings were congruent with both the patient history that Dr. Kellogg had reviewed and JA’s statements during her examination. A consistent patient history is one of the strongest indicators of sexual abuse.
Dr. Kellogg admitted that no formal studies addressed the error rates for the medical findings she used as part of the basis for her conclusion that JA was concerning for sexual abuse. She was unaware of any studies that compare “normal with abnormal, sexually abused kids” and that purported to study normal, nonabused children. She explained that she believed that it would be impossible to conduct such a study, given the nature of child sexual abuse, which made her doubtful as to the validity of a “normal” nonabused control group.
During the Article 39(a) UCMJ, session, defense counsel, using studies and journal articles written by other experts in the field of child sexual abuse, vigorously cross-examined Dr. Kellogg on her findings. Dr. Kellogg was familiar with the studies cited by defense counsel and had coauthored articles with some of the individuals cited. Dr. Kel *148 logg explained, during both direct and cross-examinations, why she disagreed with the methodology in some of the studies. She acknowledged that people in her field give different weight, or no weight, to certain anogenital findings. She also explained why a prudent doctor would take into account the “constellation of findings” in making a determination, rather than subscribe to a single diagnostic rubric.
In response to the military judge’s question whether other experts in the field would rely on the same findings that Dr. Kellogg had used to evaluate whether a child had been the victim of sexual abuse, Dr. Kellogg responded that she could not speak for every other expert in the field. But the colleague to whom she had shown the file agreed with her findings in this case. Dr. Kellogg also stated that while there is not one universally accepted methodology for relating medical findings to child sexual abuse, there are recognized standards in the medical profession that are relevant to determining if there is sexual abuse.
The military judge stated that Dr. Kellogg’s testimony was relevant and admissible because “the members ... will want to know whether there were any physical manifestations” of the alleged sexual abuse. The military judge opined that Dr. Kellogg’s testimony would help the members understand the medical evidence including the physical examination. The military judge concluded that Dr. Kellogg possessed specialized medical knowledge of and experience with the physical manifestations of child sexual abuse, and that she had done specialized work in identifying physical manifestations that had been mistaken for sexual abuse. The military judge further found that Dr. Kellogg’s testimony had sufficient factual basis because she had personally examined JA, had conducted over 6,000 similar examinations, and was very familiar with the work of other experts in the field.
Specifically addressing the methodology applied by Dr. Kellogg in arriving at her opinion in this case, the military judge ruled that it was reliable. The military judge recognized that there is disagreement as to the meaning to be ascribed to any one measurement or factor between experts in the field, but stated that Daubert does not require general acceptance. The military judge found that the conclusions drawn from anogenital findings relied upon by Dr. Kellogg had been subject to “peer review and publication; apparently hotly so.” She accepted that there could be no known error rate because of the lack of a normative population, but nonetheless found that at least to some extent, the use of anogenital measurements is accepted by experts in the field, and that the “meaning to be given to the specific measurement” goes to the weight of the opinion rather than to its admissibility. In light of these conclusions, and after conducting a M.R.E. 403 balancing test, the military judge permitted Dr. Kellogg to testify on the merits.
Before the panel, Dr. Kellogg presented her medical findings, illustrated her points by referring to pictures and exhibits, and opined that her findings were concerning for child sexual abuse. She was subjected to vigorous cross-examination by the defense counsel. JA also testified at trial. The panel convicted Appellant of the charged offenses.
The lower court summarily affirmed the approved findings and sentence in a per curiam opinion.
II. Discussion
A.
This Court reviews a military judge’s decision to admit or exclude expert testimony over defense objection for an abuse of discretion. Billings, 61 M.J. at 166; see also Joiner, 522 U.S. at 139, 118 S.Ct. 512. “[Wjhen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.” United States v. Houser, 36 M.J. 392, 397 (C.M.A.1993) (citation omitted). Furthermore, “the abuse of discretion standard of review recognizes that a judge has a *149 range of choices and will not be reversed so long as the decision remains within that range.” United States v. Gore, 60 M.J. 178, 187 (C.A.A.F.2004) (citing United States v. Wallace, 964 F.2d 1214, 1217 n. 3 (D.C.Cir.1992)). As long as a military judge properly follows the appropriate legal framework, we will not overturn a ruling for an abuse of discretion unless it was “ ‘manifestly erroneous.’ ” United States v. Griffin, 50 M.J. 278, 284 (C.A.A.F.1999) (quoting Joiner, 522 U.S. at 142, 118 S.Ct. 512). This standard “applies as much to the trial court’s decisions about how to determine reliability as to its ultimate conclusion.” Kumho Tire Co., 526 U.S. at 152, 119 S.Ct. 1167.
B.
M.R.E. 702 dictates the admissibility of expert testimony. As relevant to this case, M.R.E. 702 permits expert testimony in the “form of an opinion or otherwise” only if the testimony: (1) is “based upon sufficient facts or data,” (2) is “the product of reliable principles and methods,” and (3) the principles and methods have been “applied ... reliably to the facts of the case.” Interpreting the analogous Fed.R.Evid. 702 in Daubert, the Supreme Court both rejected the requirement that a scientific theory be “generally accepted” in the scientific community and made clear that the trial court has a “gatekeeping” role. 509 U.S. at 589, 113 S.Ct. 2786.
As gatekeeper, the trial court judge is tasked with ensuring that an expert’s testimony both rests on a rehable foundation and is relevant. Id. at 597, 113 S.Ct. 2786; Kumho Tire Co., 526 U.S. at 141, 119 S.Ct. 1167. This Court also recognizes the gatekeeping role of the military judge with respect to expert testimony offered pursuant to M.R.E. 702. Billings, 61 M.J. at 167.
In Daubert, the Supreme Court identified four factors that a judge may use to determine the reliability of expert testimony. Those four factors are: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique’s operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field. Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786.
This Court has often cited the Daubert factors, along with those in Houser, 36 M.J. at 398-99, as firm ground upon which a military judge may base a decision. But while satisfying every Daubert or Houser factor is sufficient, it is not necessary. As Daubert itself states, the test of reliability is “flexible,” and the factors do not constitute a “definitive checklist or test.” Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786. The focus is on the objective of the gatekeeping requirement, which is to ensure that the expert, “whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire Co., 526 U.S. at 152, 119 S.Ct. 1167.
The inquiry is “a flexible one,” Daubert, 509 U.S. at 594, 113 S.Ct. 2786, and “the gatekeeping inquiry must be tied to the facts of a particular case.” Kumho Tire Co., 526 U.S. at 150, 119 S.Ct. 1167 (citation and quotation marks omitted). The trial judge “must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.” Id. at 152, 119 S.Ct. 1167. Consequently, the trial judge has “the same kind of latitude in deciding haw to test an expert’s reliability ... as it enjoys when it decides whether that expert’s relevant testimony is reliable.” Id. at 152, 119 S.Ct. 1167.[3]
The focus of the military judge’s inquiry into reliability is on the principles and methodology employed by the expert, *150 without regard to the conclusions reached thereby. Daubert, 509 U.S. at 595, 113 S.Ct. 2786. At a minimum, the military judge is required under M.R.E. 702 to determine whether the conclusion could reliably follow from the facts known to the expert and the methodology used, mindful that “conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data.” Joiner, 522 U.S. at 146, 118 S.Ct. 512. Whether attempting to determine if there is “too great an analytical gap between the data and the opinion proffered,” id., or whether the proffered testimony falls “outside the range where experts might reasonably differ,” Kumho Tire Co., 526 U.S. at 153, 119 S.Ct. 1167, the goal is to ensure that expert testimony or evidence admitted is relevant and reliable, as well as to shield the panel from junk science.
C.
Turning to this case, we begin with the observation that the military judge understood and applied the correct law in deciding whether to admit Dr. Kellogg’s testimony. At the outset of her ruling, the military judge correctly summarized the standard for the admission of expert testimony, specifically stating the requirements under M.R.E. 702 and Daubert. While this Court’s case in Houser, 36 M.J. at 397-99, was not explicitly mentioned, the military judge did analyze the qualifications of Dr. Kellogg, the subject matter of the expert testimony, the basis for the testimony, and the legal relevance of the testimony in compliance with the Houser framework. The military judge specifically addressed the relevance and reliability aspects of the gatekeeping function as developed under the precedents of this Court and the Supreme Court.
While Houser sets forth the correct framework for analysis of Daubert issues, in this ease only the fifth Houser factor — the reliability of the evidence — is in dispute. Consequently, the question for this Court is only whether the military judge abused her discretion in determining that Dr. Kellogg’s conclusion that JA was concerning for sexual abuse was reliable. We conclude she did not.
The military judge’s ruling properly evaluated the methodology employed by Dr. Kellogg in determining that JA was concerning for sexual abuse. The military judge’s findings are supported by Dr. Kellogg’s testimony about her physical examination of JA, the laboratory test results, her review of JA’s medical history, her consultation with a professional colleague, and her discussion with JA in the course of the exam. She testified that it is standard practice in her field to look at all of these factors together: “the diagnosis in medicine is made on the basis of a constellation of findings.” That evidence is unrebutted. Moreover, Appellant submitted a study as part of his motion in limine,[4] which contains a classification system for the “overall assessment of likelihood of abuse,” that rests on an amalgam of physical, laboratory, and medical history findings.
Further, the military judge properly reviewed and personally questioned Dr. Kellogg as to her years of experience, her publications, her usual methodology, prior expert testimony relying on the same methodology, and her knowledge of other experts’ work in the field of child sexual abuse. See Kumho Tire Co., 526 U.S. at 150, 119 S.Ct. 1167 (reasoning that “the expert’s particular expertise” is an indicia of reliability).
Finally, Dr. Kellogg’s testimony established that the methodology she employed with JA was the same methodology she used in her examination of more than 6,000 patients. Dr. Kellogg also confirmed to the military judge that she had been qualified as an expert and been allowed to provide expert testimony on whether a patient was concerning for sexual abuse based on the methodology she used in this case, in reliance on the *151 same universe of facts, approximately 600 times.[5] On these undisputed facts, we do not think it unreasonable for the military judge to have found Dr. Kellogg’s methodology reliable.
Appellant does not so much challenge the overall methodology employed by Dr. Kellogg, however, as he does question the analytic connection between the physical findings from Dr. Kellogg’s examination of JA and her testimony that those findings supported the opinion that JA was concerning for sexual abuse. But Appellant’s challenge is rooted in a fundamental misapprehension of Dr. Kellogg’s methodology. Dr. Kellogg did not identify any single physical finding as a litmus test for sexual abuse. Instead it was her “constellation of findings” that was the basis for her expert opinion. See United States v. Traum, 60 M.J. 226, 236 (C.A.A.F.2004) (approving an expert doctor’s use of all facts available in reaching a medical opinion).[6]
We observe that this case is not one where Appellant asserts that Dr. Kellogg was deficient because she failed to perform other relevant medical tests that would either bolster or refute her medical opinion. Appellant’s challenge is more narrow and focused. In Appellant’s view, the hymenal thickening and anal dilation findings are unreliable because they fail to satisfy the Daubert factors.
We reject this assertion for three reasons. First, Dr. Kellogg testified to both hymenal thickening and anal dilation as objective medical and physical findings at the sites of the alleged sexual abuse. Moreover, she described how factors, such as age, and other physical conditions, might cause these findings. Those factors were ruled out before she considered the findings relevant to possible sexual abuse. Second, defense counsel provided an expert study at trial that specifically included these findings, placing the use of anal dilation and hymenal thickening in the realm of findings where reasonable experts might disagree. Third, the military judge clearly understood the Daubert factors, the manner in which the hymenal and anal dilation findings did not conform to those factors, and nonetheless found the evidence reliable.
We cannot say that it was manifestly erroneous for the military judge to find that the evidence relating to hymenal thickening and anal dilation was reliable. Nothing in the precedents of the Supreme Court or this Court requires that a military judge either exclude or admit expert testimony because it is based in part on an interpretation of facts for which there is no known error rate or where experts in the field differ in whether to give, and if so how much, weight to a particular fact in deriving an opinion. See United States v. Norris, 217 F.3d 262, 269-71 (5th Cir.2000) (holding testimony admissible under Daubert even though “no error rate was known” and “no independent validation” of the expert’s testing had occurred); *152 McReynolds v. Sodexho Marriott Sens., Inc., 349 F.Supp.2d 30, 34 (D.D.C.2004) (holding testimony admissible under Daubert although experts “might well differ ... over various details of their analyses”). “Such a bright-line requirement would be at odds with the liberal admissibility standards of the federal [and military] rules and the express teachings of Daubert.” Amorgianos v. Amtrak, 303 F.3d 256, 267 (2d Cir.2002). Daubert expressly recognizes that the adversary system, including “[vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.” 509 U.S. at 596, 113 S.Ct. 2786.
As the military judge recognized, and as the testimony of Dr. Kellogg and the two exhibits submitted by the defense at the motion supported, different experts in the field of child sexual abuse give different weight to anogenital findings, and some discount certain types of anogenital findings altogether. One expert study provided by the defense lists both a thickened hymen and anal dilation as factors in assessing child sexual abuse. Another expert study provided by the defense would not rely on anal dilation as a factor in assessing child sexual abuse. Given these facts, it does not appear that the analytic gap between these physical findings and Dr. Kellogg’s conclusion that they supported her diagnosis that JA was concerning for sexual abuse was too great, or that Dr. Kellogg’s testimony on these points “fell outside the range where experts might reasonably differ.” Kumho Tire Co., 526 U.S. at 153, 119 S.Ct. 1167 (citing Daubert, 509 U.S. at 596, 113 S.Ct. 2786).
Nor was the military judge’s admission of Dr. Kellogg’s consideration of the increased white blood cells in JA’s vagina unreasonable, given the diagnostic approach taken by Dr. Kellogg. This finding is different than the others, not qualitatively, but because there was no explicit reference to JA’s increased white blood cells in the military judge’s ruling, and, unlike the other anogenital findings, this factor is not itself mentioned in any of the articles written by experts presented at the motion hearing.
Nonetheless, we conclude that it was not manifestly erroneous for the military judge to admit this testimony. The military judge ruled that Dr. Kellogg’s “role [was] to assist [the panel] in understanding the physical examination” and therefore permitted her to address “any physical manifestations” of sexual abuse. The evidence in the record supports this ruling by the military judge.
Dr. Kellogg described why she thought the increased white blood count was an “unusual” and concerning finding. She explained that it was unusual because young children do not have an increased white blood cell count except under a few specific circumstances, which she ruled out. She further explained that “the hymen acts as a protective shield in normal children,” and that a larger than normal hymenal opening could lead to irritation and increased white blood cells in the vagina. She elaborated on this point, testifying that “we sometimes see [it][ ] in victims of sexual abuse.” She therefore concluded that the increased white blood cell count, in conjunction with the patient history and other findings, was concerning for sexual abuse because she had ruled out infection, JA’s hymen did not cover her vaginal opening, and a girl of JA’s age does not normally have increased white blood cells in her vagina.
We observe there was some conflict in Dr. Kellogg’s expert testimony as to the exact size of a hymenal opening that is clinically significant. In her Article 39(a), UCMJ, testimony, Dr. Kellogg states that JA’s hymen is abnormally short because it covers only 2.5 millimeters of the opening. At another point in her Article 39(a), UCMJ, testimony she states that the hymen only covers one-eighth to one-tenth of the opening when it should cover one-third. On cross-examination defense counsel pointed out that Dr. Kellogg had previously stated that a normal range for this particular measurement could be between one and four millimeters, and because JA’s hymenal rim measured 2.5 millimeters it fell within what could be considered normal range. These statements were not harmon *153 ized during the Article 39(a), UCMJ, testimony.
Notwithstanding this point, we do not consider any slight flaw with regard to this single finding so significant as to undermine the otherwise proper reliability determination of the military judge. See Amorgianos, 303 F.3d at 267 (“The judge should only exclude the evidence if the flaw is large enough that the expert lacks ‘good grounds’ for his or her conclusions.”); Roane v. Greenwich Swim Comm., 330 F.Supp.2d 306, 317 (S.D.N.Y.2004) (quoting In re Paoli, 35 F.3d 717, 746 (3d Cir.1994)) (“Minor flaws in an expert analysis or slight modifications of otherwise reliable methods will not render an expert opinion per se inadmissible.”).
In light of Dr. Kellogg’s testimony, and in the context of other anogenital medical findings, it was reasonable for the military judge to admit testimony on JA’s increased white blood count. See Daubert, 509 U.S. at 593-94, 113 S.Ct. 2786. “Trained experts commonly extrapolate from existing data.” Joiner, 522 U.S. at 146, 118 S.Ct. 512. We do, however, have serious reservations regarding whether this individual finding would have been admissible without being presented in the context of the other medical findings in this case.
Given the standard of review in this case, we cannot say that the military judge abused her discretion. It was not manifestly erroneous for the military judge to leave this admissible but, in Appellant’s view, shaky evidence to the adversarial process. Daubert, 509 U.S. at 596, 113 S.Ct. 2786. It is the members who “must decide among the conflicting views of different experts, even though the evidence is ‘shaky.’ ” Kumho Tire Co., 526 U.S. at 153, 119 S.Ct. 1167 (citing Daubert, 509 U.S. at 596, 113 S.Ct. 2786).
III. Conclusion
In summary, the linchpin of this case is Dr. Kellogg’s reliance on a “constellation of findings” generated from a reliable methodology as the basis of her expert opinion. We conclude that the military judge properly performed her “gatekeeping” duty established in Daubert. 509 U.S. at 593-94, 113 S.Ct. 2786.
The decision of the United States Army Court of Criminal Appeals is affirmed.

. "Concerning” is a medical term for evidence that is consistent with possible sexual abuse.

. Dr. Kellogg was a board-certified pediatric physician with thirteen years of experience focusing on child sexual abuse. She was a full professor in the pediatrics department of the University of Texas Health Science Center in San Antonio, Texas. She was the Director of the Alamo Children’s Advocacy Center, where she had examined more than 6,000 children in possible sexual abuse cases. She had published twenty articles on child sexual abuse in scholarly and professional journals and been elected to the Ray Heifer Society, which is composed of the 100 physicians in the world considered to be experts by their peers in the field of child sexual abuse.

. The dissent, while citing Daubert and Kumho Tire Co., gives neither latitude nor leeway to the military judge. Moreover, it gives no credence to the methodology of a medical expert, despite her unquestioned experience, application of the same diagnostic methodology in this case as she used in daily practice, and unrebutted evidence that she had given expert testimony based on the same methodology in approximately 600 other cases.

. The study was Evolution of a Classification Scale: Medical Evaluation of Suspected Child Sexual Abuse, by Joyce A. Adams. The defense referred to Ms. Adams as an expert.

. The military judge specifically probed this area in her questions to Dr. Kellogg:
Q. Okay. And have you been recognized as an expert in each of those 600 [cases]?
A. Yes I have.
Q. And have you been allowed to testify in the past that your findings were "concerning” for child sexual abuse?
A. Yes I have.
Q. As the form of your opinion in that exact manner?
A. Yes, ma'am.
Q. About how many times?
A. "Concerning” specifically? Is that what you're saying?
Q. Yes. Concerning that type of an opinion, that “X,” "Y,” and "Z” findings were "concerning” or "consistent” with child sexual abuse.
A. Based on exam alone or everything?
Q. Based on everything.
A. Based on eveiything. I have probably — I would say about 90 percent of my actual testimony has been to that effect that the findings, the history and/or exam, was consistent with possible child abuse.

. The dissent’s reliance on In re Agent Orange Prod. Liab. Litig., 611 F.Supp. 1223 (E.D.N.Y.1985), for a contrary view is unwarranted. That case, of course, is a pre-Daubert case, a mass tort case, and does not address the admissibility of expert testimony. Moreover, Chief Judge Weinstein based his ruling in part on the fact that the experts in that case had not examined the victims. Id. at 1235. In re Agent Orange does not stand for the proposition that a medical doctor, basing her opinion on a constellation of observed anogenital findings in a eight-year-old girl (after ruling out other explanations for the findings), laboratory results, and medical history findings, is providing an opinion that is either subjective or speculative.