# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39714**

————————————

**UNITED STATES**
*Appellee*

v.

**Jesse A. COOL**
Staff Sergeant (E-5), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 26 October 2020

————————————

*Military Judge*: Shawn S. Speranza.

*Approved sentence*: Bad-conduct discharge and reduction to E-1. Sentence adjudged 1 March 2019 by GCM convened at Hurlburt Field, Florida.

*For Appellant:* Lieutenant Colonel Anthony D. Ortiz, USAF; Major Megan E. Hoffman, USAF.

*For Appellee*: Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges*.

Judge RICHARDSON delivered the opinion of the court, in which Senior Judge POSCH and Judge MEGINLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

RICHARDSON, Judge:

A general court-martial comprised of officer members convicted Appellant, contrary to his pleas, of two specifications[1] of attempted sexual abuse of a child in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[2] The court-martial sentenced Appellant to a bad-conduct discharge and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant raises four issues on appeal: (1) whether his conviction is factually and legally sufficient; (2) whether the Government failed to disprove the defense of entrapment; (3) whether the military judge abused his discretion when he denied the defense motion to compel the appointment of a confidential expert consultant in forensic psychology; and (4) whether the military judge abused his discretion by instructing the court members on false exculpatory statements. We find no prejudicial error and affirm the findings and sentence.

## I. BACKGROUND

On 9 August 2017, Appellant, a 29-year-old male Airman assigned to Hurlburt Field, Florida, under the username "kacool92" messaged "HALEEEBUG" through Kik,[3] saying "Heyyy."[4] Fifteen minutes later he sent "HALEEEBUG" an image of an erect penis held taut inside shorts. The next day Appellant sent another message; "HALEEEBUG" replied the day after. "HALEEEBUG" told Appellant her mother was in the Air Force, they lived "in Hurlburt," and she was 14 years old. "HALEEEBUG" was actually Special Agent (SA) SW, an investigator with the Air Force Office of Special Investigations (AFOSI) at Hurlburt Field, pretending to be a 14-year-old military-dependent girl as part of an undercover law enforcement operation to identify individuals exploiting chil-

---

[1] Specification 1 alleged an attempt by intentionally communicating indecent language on divers occasions. Specification 2 alleged an attempt by engaging in indecent conduct by sending pictures of male genitalia on divers occasions; Appellant was found guilty of sending a picture on one occasion.

[2] Unless otherwise noted, all references in this opinion to the Uniform Code of Military Justice, Rules for Courts-Martial, and Military Rules of Evidence are to the *Manual for Courts-Martial, United States* (2016 ed.).

[3] Kik is a mobile application used to chat, including sending instant messages, photos, and videos.

[4] This opinion quotes messages as they appear in the record of trial and without correction.

dren on the Internet. Appellant and "HALEEEBUG" communicated intermittently over the next two months, ending shortly after Appellant deployed in mid-October 2017. A recurring topic of the conversations was Appellant asking for "pics" of "HALEEEBUG," including "booty pics."[5] "HALEEEBUG" sent Appellant two photos of her face and one of her feet. In addition to the aforementioned photo of a penis inside shorts, Appellant sent "HALEEEBUG" a photo of a man's scrotum and erect penis.[6]

SA SW traced the Kik profile "kacool92" to an email address containing the word "cool," then found a "Jesse Cool" stationed at Hurlburt Field. AFOSI agents interviewed Appellant in January 2018 at his deployed location. Following a proper rights advisement and waiver, Appellant admitted communicating with "HALEEEBUG" and signed a sworn statement apologizing "to the mother of that child."

## II. DISCUSSION

### A. Legal and Factual Sufficiency and Entrapment

Appellant asserts that the evidence for the two offenses of which he was convicted was legally and factually insufficient, and does not overcome the defense of entrapment raised at trial. Specifically, Appellant asserts the Government did not meet its burden of proving Appellant believed he was communicating with someone under 16 years of age "and not an adult or a computer program," nor disproving the defense of entrapment beyond a reasonable doubt. Appellant points to evidence that he did not believe "HALEEEBUG" was who she said she was and that he was not seeking out minors in his chats. We are not persuaded that Appellant was entrapped and find his convictions both legally and factually sufficient.

#### 1. Additional Background

Appellant's conversations with "HALEEEBUG" started on 11 August 2017, when "HALEEEBUG" finally replied to Appellant's penis photo and message "[h]ey girl!" Appellant said his name was "Keiran" and asked "HALEEEBUG" where she was from. Three hours later, the following exchange occurred:

> ["HALEEEBUG"]: I'm in Florida
>
> [Appellant]: Fort Walton?

---

[5] In this opinion, based on the testimony at trial we consider "booty pic" to be an image that includes the clothed or unclothed buttocks.

[6] The members specified this photo as the single occasion in Specification 2 for which Appellant was guilty.

["HALEEEBUG"]: Nice I live on Hurlburt

[Appellant]: I work on [H]urlburt

Military or dependent?

Any pics?

Four hours later, after getting no response, Appellant again messaged "HALEEEBUG":

[Appellant]: You looking to hook up?

["HALEEEBUG"]: Yeah

I'm dependent my mom is in the Af

[Appellant]: We should hook up…Have pics?

How old are you and what are you looking for?!

Four hours later, after getting no response, Appellant sent "HALEEEBUG" a photo of his face, stating "What do you think?" then later "You there?"

Appellant attempted contact with "HALEEEBUG" three more times on the morning of 14 August 2017. He asked if she wanted to swap pictures. Finally "HALEEEBUG" replied, and the following exchange occurred:

["HALEEEBUG"]: Hey. Ur cute. I live in Hurlburt with my mom. I'm 14

We can swap if you want

[Appellant]: Oh nevermind

I appreciate you telling me you are underage

I apologize

["HALEEEBUG"]: Np

Bye

[Appellant]: Are you really only 14?

"HALEEEBUG" responded the next day, saying "Yeah why." Several hours later, Appellant replied, "Just wondering what you were looking for exactly," then "???" Three days later, Appellant said, "Helllooooo" and a few hours later asked, "Where's my pics."

The next day, on 19 August 2017, "HALEEEBUG" finally responded, saying, "I didn't think you were interested cuz my age?" to which Appellant responded the next day, "I just want to see what you look like."

4

They continued messaging each other sporadically over the next couple of weeks. Throughout, Appellant asked "HALEEEBUG" for "pics," including after this exchange:

["HALEEEBUG"]: I'm not into trading pics

Sorry

[Appellant]: What you into

["HALEEEBUG"]: Not sure. What r u into

"HALEEEBUG" then sent Appellant a winking/tongue emoji and a photo of her face and shirt. Appellant replied, "[a]nymore pics" and hours later "HALEEEBUG" said, "You first" and "What r u doing."

Their communications continued over the next two days, then on the morning of 30 August 2017, Appellant sent her the same penis photograph he sent on 9 August 2017. This prompted the following exchange:

[Appellant]: Sorry wrong person

["HALEEEBUG"]: Nice pic [blowing-kiss emoji]

[Appellant]: Oh you liked it?

["HALEEEBUG"]: Yeah

Who did u mean 2 send it 2

[Appellant]: Another female that had a pic that looks like yours

["HALEEEBUG"]: Ohhhh

[Appellant]: You like it tho

["HALEEEBUG"]: Yeah [tongue-out emoji]

Wht do u do in the af

[Appellant]: SF

["HALEEEBUG"]: Sf?

[Appellant]: Security Forces

Check id's at the gate

["HALEEEBUG"]: Oh.

Ok. Nice

[Appellant]: Why

That bad

["HALEEEBUG"]: No I think there cute

5

[Appellant]: I'm cute or they are cute

["HALEEEBUG"]: My moms in intel

U too lol

[Appellant]: Your mom?

What rank is she

["HALEEEBUG"]: She's a shy

Sergeant

I don't know ranks. She's sgt something

Why

[Appellant]: Have a live pic?

After several more conversations about "pics," the conversation over the next few days again was more detailed:

["HALEEEBUG"]: Your playing games. The only thing u sent me was a partial face pic.

[Appellant]: Same with you

["HALEEEBUG"]: You haven't told me what u want. I feel like u r trying 2 creep on me

I just don't want 2 get in trouble

[Appellant]: Why would you get in trouble

["HALEEEBUG"]: Cuz your sf

[Appellant]: And?

We can go pic for pic

["HALEEEBUG"]: Duh I'm 14 my mom would kill me

. . .

[Appellant]: You tell me

Ask me

What do you like

What have you done?

["HALEEEBUG"]: I am up 4 anything

Really just kissing and some touching [winking face with tongue emoji]

[Appellant]: Nothing else?

6

["HALEEEBUG"]: What's your fav thing 2 do

[Appellant]: Obviously sex

and everything leading up to it

["HALEEEBUG"]: What kind of sex

[Appellant]: What you mean

["HALEEEBUG"]: Never mind being dorky [blowing-kiss emoji]

On 16 September 2017, Appellant traveled to Fort Bliss, Texas, for pre-deployment training. On 18 September 2017, he continued his communications with "HALEEEBUG":

["HALEEEBUG"]: Whatever u r trying to find my mom

[Appellant]: Ehhhhh no

I swear I'm not

["HALEEEBUG"]: U just want pics. I'm not lookin 4 a boyfriend

[Appellant]: Me neither

["HALEEEBUG"]: What do u want then

[Appellant]: Let's just have fun and exchange some pics

["HALEEEBUG"]: That's not fun.

[Appellant]: Try it

["HALEEEBUG"]: Nope

[Appellant]: K

["HALEEEBUG"]: I don't know who u are

[Appellant]: I don't know who you are

["HALEEEBUG"]: Whatever let me know when ur being real

[Appellant]: I am being real

Quit being shy

["HALEEEBUG"]: I just not lookin to share pics. Ur being weird

[Appellant]: What are you on here for then

["HALEEEBUG"]: Lookin for something real. Someone 2 teach me things [winking face with tongue emoji]

[Appellant]: Yeah eventually

Why not play around

["HALEEEBUG"]: Wht do u mean

[Appellant]: Send pics then teach things

The conversation continued in this vein, with Appellant asking for "pics" and "HALEEEBUG" responding she was looking for "fun" but did not want to trade pics.

Five days later, Appellant continued the conversation where it left off, saying, "[w]ant to trade pics yet?" Having received no response, six days later on 28 September 2017 Appellant sent "HALEEEBUG" a photo of a man's scrotum and erect penis.

Appellant left pre-deployment training on 12 October 2017, when he traveled through Al Udeid Air Base, Qatar, to begin a deployment in Kuwait. Appellant's last conversation with "HALEEEBUG" was on 16 October 2017; he ended with "[p]ics then hook up."

**2. Law**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

The "government is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted). This includes proving an accused's belief about whether another person is a minor. *See United States v. Maxwell*, 45 M.J. 406, 425 (C.A.A.F. 1996).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed

the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

With respect to the affirmative defense of entrapment, Rule for Courts-Martial 916(g) states: "It is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense." The defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.* (citations omitted).

"Inducement" means more than merely providing an appellant the means or opportunity to commit a crime. *United States v. Howell*, 36 M.J. 354, 360 (C.M.A. 1993). Instead, the Government's conduct must:

> create[ ] a substantial risk that an undisposed person or otherwise law abiding citizen would commit the offense. Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id.* at 359–60 (emphasis, internal quotation marks, and citations omitted).

The Government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon without implicating the defense of entrapment. *Jacobson v. United States*, 503 U.S. 540, 548 (1992); *see also Howell*, 36 M.J. at 358; *Whittle*, 34 M.J. at 208. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932) (citations omitted); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973). For example, law enforcement officers may pretend to be someone other than a government agent. *See Howell*, 36 M.J. at 358.

In order to find Appellant guilty of an attempt offense under Article 80, UCMJ, the Government was required to prove beyond a reasonable doubt that he did a certain overt act, that the act was done with the specific intent to commit a certain offense, that the act amounted to more than mere preparation, and that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.b.

In order for Appellant to be found guilty of the attempted offense of sexual abuse of a child, as alleged in Specification 1, the Government was required to prove beyond a reasonable doubt that Appellant intended to commit a lewd act upon "HALEEEBUG" by intentionally communicating indecent language to a child whom he believed had not attained the age of 16 years, with an intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45b.b.(4)(d). Similarly, for Appellant to be found guilty of the attempted offense of sexual abuse of a child, as alleged in Specification 2, the Government was required to prove beyond a reasonable doubt that Appellant intended to commit a lewd act upon "HALEEEBUG" by engaging in indecent conduct intentionally with a child who he believed had not attained the age of 16 years, to wit: sending pictures of male genitalia to "HALEEEBUG," which conduct amounted to a form of immorality relating to sexual impurity which was grossly vulgar, obscene and repugnant to common propriety, and tended to excite sexual desire or deprave morals with respect to sexual relations. *See MCM*, pt. IV, ¶ 45b.b.(4)(e).

### a. Analysis of Entrapment

At trial, Appellant appeared undecided about whether to raise the affirmative defense of entrapment. Just before the military judge finalized his instructions on findings, trial defense counsel specifically requested the military judge provide the members "[t]he entrapment instruction." The military judge agreed, and provided the members the standard entrapment instruction.[7] He instructed the members, *inter alia*, "[t]he prosecution's burden of proof to establish the guilt of the accused applies to the elements of the offenses of attempted sexual abuse of a child alleged in Specifications 1 and 2 of the Charge, but also to the issue of entrapment. In order to find the accused guilty, you must be convicted beyond a reasonable doubt that the accused was not entrapped."

Appellant asserts the agent "posing as HALEEEBUG, was the instigator of sexual talk in conversations" with Appellant, and that "to the extent that [Appellant] communicated any indecent language at all to HALEEEBUG, he did

---

[7] The military judge's instruction was modeled on the evidentiary instructions in the *Military Judges' Benchbook*. Dept. of the Army Pamphlet 27-9 at 995 (10 Sep. 2014).

so only at her urging, and after being asked several times, in several ways, what kind of sex he wanted or liked."

We do not agree "HALEEEBUG" was the "instigator." When Appellant first contacted "HALEEEBUG," he included a photo of an erect penis. This opening gambit suggested Appellant was looking to have some form of sexual encounter with another Kik user. He asked "HALEEEBUG" for "pics," inquired if she wanted to "hook up" and what she was "looking for," sent a photo of his face, and asked her age. When she told him she was 14 years old but "can swap [pics] if you want," he reacted as one who is *not* predisposed to commit lewd acts with a child: "Oh, nevermind. I appreciate you telling me you are underage. I apologize." The agent posing as "HALEEEBUG" accepted Appellant's decision to walk away, responding, "[no] p[roblem]" and "[b]ye."

Appellant, however, did not stay away. Without any government urging, he continued to communicate with a person on Kik who had readily accepted his decision not to talk to a child. Appellant asked, "[a]re you really only 14?" and she replied the next day, "[y]eah why." The next several messages all were from Appellant, wherein he said, "[j]ust wondering what you were looking for exactly. ??? Helllooooo. Where's my pics." Appellant was not put off by "HALEEE-BUG's" delayed and sparse responses, her stated age, nor her clear statement that she is "not into trading pics," to which Appellant responded, "[w]hat you into." This evidence firmly supports a conclusion that Appellant was predisposed to commit the charged offenses.

While "HALEEEBUG" invited Appellant to talk about his sexual desires and promised more "pics" if they met in person, Appellant stayed focused on trying to get "HALEEEBUG" to send him "pics" of herself. Appellant repeatedly requested "booty pics." Appellant asked "HALEEEBUG" if she wanted to "trade pics yet?" then soon thereafter—with no prompting at all—sent her a photograph of a man's scrotum and erect penis.

Appellant demonstrated a predisposition to commit the convicted offenses, both of which he committed "without being offered extraordinary inducements." *Whittle*, 34 M.J. at 208 (citations omitted). As described above, Appellant took the initiative to commit the offenses. By doing so, he demonstrated his predisposition.

Finding beyond a reasonable doubt that the Government did not induce Appellant to commit the offenses of which he was convicted and that Appellant was predisposed to commit them, we conclude there was no entrapment. Having considered the evidence produced at trial in the light most favorable to the Government, we also conclude that the evidence was legally sufficient for the court members to find that the Government proved beyond a reasonable doubt that Appellant was not entrapped.

Having decided there was no entrapment, we next consider whether the evidence is legally and factually sufficient to support the findings of guilt on the Charge and its specifications.

### b. Analysis of Legal and Factual Sufficiency

We dismiss outright Appellant's contention that the Government failed to prove beyond a reasonable doubt that Appellant believed he was talking to a child and not a computer program (or "bot"). Appellant and "HALEEEBUG" talked not only generically about "pics" and "fun," they conversed about specific details, including, *inter alia*, Hurlburt, Security Forces, gate guards, Air Force, Sergeant, and Intel. The weight of the evidence heavily favors a conclusion that these were not conversations generated by a computer program.

The cornerstone of Appellant's defense at trial was that Appellant did not believe he was talking to a child; he mounts a similar defense on appeal. Appellant quotes his statements in the messages and to AFOSI agents about whether "HALEEEBUG" was real, as well as the lack of other evidence indicating Appellant had a sexual interest in minors, to support his contention the Government did not meet its burden at trial. We concur the evidence does not indicate Appellant was seeking out minors; however, that is not a necessary precursor to believing that a minor, once found, is actually a minor.

Appellant points us to the numerous messages wherein Appellant asks "HALEEEBUG" whether she is real, and to send "pics" to prove it. Appellant argues this proves he questioned her identity as a 14-year-old girl. While that is a conclusion to draw from the evidence, it is not the only reasonable conclusion. These same messages indicate Appellant questioned "HALEEEBUG's" identity to goad her into sending him more—and more revealing—photographs of herself.

Appellant also points us to his interview with AFOSI agents, during which he denied believing "HALEEEBUG" was who she purported to be. The court members were able to review an audio-visual recording of that interview, hear testimony from an interviewing agent, and read Appellant's post-interview written statement before determining the believability of any of Appellant's individual statements. After considering all the evidence in the case, they could have drawn the reasonable conclusion that Appellant lied to investigators when he said he "never thought that she was real" in order to escape the consequences of his actions.

In assessing legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Government. We conclude that a rational factfinder could have found beyond a reasonable doubt all the essential elements of Appellant's convicted offenses, including that Appellant believed he was communicating with a person under

the age of 16 years. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions on the Charge and its specifications are both legally and factually sufficient.

## B. False Exculpatory Statement Instruction

### 1. Additional Background

The military judge admitted into evidence, without objection, Prosecution Exhibit 1, a redacted[8] copy of Appellant's recorded interview by AFOSI agents. The Government published the exhibit to the court members by playback in open court. The first topic was Appellant's use of Kik:

> SA [JM]: Do you have any of the other apps like WhatsApp's or Kik?
>
> [Appellant]: I do have WhatsApp, and I use that to talk to my leadership here.
>
> SA [JM]: Okay.
>
> [Appellant]: And I did have Kik when I was at home.
>
> SA [JM]: Okay. Alright. Tell me about that? What do you use Kik for?
>
> [Appellant]: I use it to talk to, I guess, I was in the chat room.
>
> SA [JM]: Okay. How long did you have it?
>
> [Appellant]: Maybe 2 to 3 months.
>
> SA [JM]: What's your username, do you remember?
>
> [Appellant]: It should be JACOOL34.

Appellant told the investigators that he was active on Kik for two to three months, between about May and September, and arrived at Al Udeid in early October before going to Kuwait. Their conversation continued:

> SA [JM]: Early October. Okay. Have you used Kik at all since you have been here?
>
> [Appellant]: Yes, and it was to talk to a friend that's at Al Udeid.
>
> SA [JM]: What screen name did you use for that?

---

[8] The redacted portions included administrative matters at the beginning and end of the interview, as well as time Appellant spent alone in the interview room.

[Appellant]: The same one. I'm sure the same one. I only have one so.

. . .

SA [JM]: And have you ever had other Kik profiles other than that?

[Appellant]: No.

After talking about chat rooms, the agent moved the conversation to "HALEEEBUG":

SA [JM]: Okay. So does the username "HALEEEBUG" ring any bell to you?

[Appellant]: I've seen a lot of usernames. The bug part sounds familiar. Not that name specifically.

SA [JM]: I have a photo actually here. See if this person appears familiar to you at all. Do you recognize that photo? Have you ever seen that?

[Appellant]: I think I've seen it, yeah.

SA [JM]: Okay, tell me about that?

[Appellant]: I am pretty [sic] that was—it might have been a profile picture in that chat room.

SA [JM]: And tell me about your communications with that person?

[Appellant]: She might have replied on there from that chat room. Other than that, I don't remember anything specifically here.

SA [JM]: Okay. What did you guys talk about?

[Appellant]: I think she said, um, she might have replied to one of the pictures I posted in that chat room. I don't remember what we talked about. Yeah, I don't even remember about any of the conversations, really.

SA [JM]: Okay.

[Appellant]: I mean, content wise. I kind of remember the picture.

SA [JM]: Okay. What other picture, like what do you remember about it?

14

[Appellant]: I remember the hearts. I don't remember her face specifically. I just remember like the heart stuff on it.

The conversation moved back to Appellant's use of Kik:

SA [JM]: Gotcha. Alright. At any point have you had any other accounts on Kik?

[Appellant]: No.

SA [JM]: Okay. And what email address did you use to set your Kik account?

[Appellant]: It was jacool_jc3@[***].com.

SA [JM]: Okay. And you said that you thought you set it up a while ago, but then just started using it like in that timeframe?

[Appellant]: I was—it had been set up years ago.

SA [JM]: When was that?

[Appellant]: The Kik account?

SA [JM]: Yeah.

[Appellant]: I don't know. I know it was a long time ago, and I just used it off and on. And I deleted the email a long time ago. That's—I don't know about that.

. . .

SA [JM]: So if I was to tell you that we had a conversation that we – saw a conversation in which you guys exchanged these pictures with each other, like just like a private conversation, can you help me understand like how that would have happened?

[Appellant]: If she was in that chat room, then, I probably didn't—she responded to me. I probably talked to her if she was in that chat room.

Trial counsel requested the military judge instruct the court members on Appellant's false exculpatory statements. At issue on appeal are two of those statements: (1) if Appellant talked to "HALEEEBUG," it would have been because she initiated conversation with him; and (2) Appellant had only one Kik profile, and it was JACOOL34. Trial defense counsel objected, arguing those statements showed lack of memory and were not definitive statements. The

military judge disagreed, and provided the members a tailored instruction[9, 10] on false exculpatory statements, including the following:

> There has been evidence that after the offenses were allegedly committed, the accused may have made false statements about the alleged offenses, specifically that he told an investigator that he chatted with "HALEEEBUG" after "HALEEEBUG" initiated contact with him and that JACOOL34 was his only Kik profile.

### 2. Law

Whether a military judge properly instructs the court members is a question of law we review de novo. *United States v. Hibbard*, 58 M.J. 71, 75 (C.A.A.F. 2003) (citation omitted). A military judge's decision to provide an instruction is reviewed for an abuse of discretion. *United States v. Anderson*, 51 M.J. 145, 153 (C.A.A.F. 1999) (citation omitted).

"[F]alse statements by an accused in explaining an alleged offense may themselves tend to show guilt" but a "general denial of guilt does not demonstrate any consciousness of guilt." *United States v. Colcol*, 16 M.J. 479, 484 (C.M.A. 1983) (citation omitted). When raised by the evidence, the military judge may provide the members a general instruction on false exculpatory statements. *See United States v. Opalka*, 36 C.M.R. 938, 944–45 (A.F.B.R. 1966) (approving the instruction as a correct statement of law and finding that failure to identify particular statements was not prejudicial).

### 3. Analysis

Appellant does not claim the instruction was legally incorrect; he claims it was unwarranted and he suffered material prejudice as a result. "By giving the false exculpatory statement instruction when in fact no false exculpatory statements were at issue, the military judge drew the attention of the court-martial panel to a non-issue. In so doing, he put his thumb on the scales in favor of the Government and against [Appellant]." He also cites *Colcol*, implying his statements were no more than general denials of guilt. We find the instruction was raised by the evidence, the military judge did not abuse his discretion when he provided the instruction, and the instruction did not materially prejudice Appellant.

Appellant points out the statement regarding his Kik username—"[i]t *should* be JACOOL34"—was not strictly a false statement, and "JACOOL" was

---

[9] The military judge's instruction was modeled on the evidentiary instructions in the *Military Judges' Benchbook*, Dept. of the Army Pamphlet 27-9 at 1122 (10 Sep. 2014).

[10] Trial defense counsel did not request the military judge use only the general instruction with no tailoring to identify particular statements.

part of his email address associated with his Kik account. While "should be" can be understood as not definitive, in this context it could also mean "JACOOL34" is the username investigators should expect to find. Moreover, read in conjunction with his additional statements to AFOSI agents that he had only one screen name and that it was "the same one," and he has never had other Kik profiles, one can conclude Appellant made a false statement about his Kik username.

Appellant also points out he used the word "probably" in his statements to AFOSI agents about whether "HALEEEBUG" initiated contact, which he argues is not a false statement and does not indicate a motive to deceive, but instead shows lack of memory. We note that while Appellant said "might have" and "probably" in answering AFOSI agents' questions about initiating contact, he did not express an inability to remember. "She might have replied on there from that chat room. *Other than that*, I don't remember anything specifically here." (Emphasis added). When asked what they talked about, Appellant stated, "I think she said, um, she might have replied to one of the pictures I posted in that chat room. I don't remember what we talked about. Yeah, I don't even remember about any of the conversations, really." When confronted with a suggestion the agents saw a private conversation in which Appellant exchanged photographs with "HALEEEBUG," Appellant responded, "[i]f she was in that chat room then, I probably didn't—she responded to me, I probably talked to her if she was in that chat room." Taken as a whole, one can reasonably conclude Appellant was not being truthful to AFOSI agents about who contacted whom in an attempt to minimize his conduct tending to show guilt.

Finally, neither of these statements were general denials of guilt. They were denials about specific facts relevant to the investigation of attempted sexual abuse of a child: whether "kacool92" was a Kik username associated with Appellant, and whether Appellant initiated contact with "HALEEEBUG."

## C. Denial of Expert Assistance

Appellant contends that the military judge erred by denying the defense motion to compel the appointment of an expert forensic psychologist. We disagree.

### 1. Additional Background

On 4 November 2018, the Defense requested the appointment of Dr. MD to serve as an expert in the field of forensic psychology. On 5 December 2018, the convening authority denied the Defense's request for the appointment of Dr.

MD, concluding that the "request does not establish the relevance or necessity for the requested expert consultant."[11]

On 12 December 2018, the Defense filed a motion to compel the Government to appoint an expert in the field forensic psychology, which the Government opposed. On 28 December 2018, after considering the filings of the parties, the military judge denied the motion to compel; he later thoroughly articulated his decision in a written ruling dated 9 February 2019.

The Defense requested reconsideration of this ruling. On 20 February 2019, after hearing testimony from Dr. MD and argument of counsel, the military judge upheld his denial. In an oral ruling, he considered the Defense's arguments about how expert assistance was necessary for an adequate defense: (1) to assist the panel in understanding theoretical models related to internet deception in sex, online relationships, and features of the online environment and online communication that facilitate online deception; (2) to explain the child solicitation research conducted by the task force appointed by the U.S. Government that served as the foundation for development of undercover sex stings and underpinned its aims and scope; (3) to detail the process of grooming a child for sexual activity, discuss how this may occur online, referencing literature related to online grooming; and (4) to assist the panel in understanding basic principles of human motivation that relate to a need to belong and how a need to belong and social exclusion might lead to degradations in cognitive performance including executive function.

He considered Dr. MD's testimony relating to common online behaviors, including "warrants,"[12] identity deception, and suspicion of "bot" use; the undercover agent's techniques when compared to operating standards; the complexity of the psychology of technology and sexuality; using computer linguistic analysis to compare Appellant's chats to similar cases; and Appellant's psychological traits which "could" be useful in sentencing to show whether Appellant was predisposed to commit the offense. In an oral ruling, he concluded:

> However, none of these arguments and assertions demonstrate why an exploration into this complex psychological field is necessary in this case. Any complexity related to the psychology of technology and sexuality is not the linchpin of the Government's case. Likewise, the Defense has failed to demonstrate why an

---

[11] The Defense also requested, and the convening authority granted, appointment of a digital forensics expert.

[12] The military judge stated "asking for pictures to verify the identity or persona of a chat person" is an example of a warrant.

exploration of psychological traits, the extrapolation of recidivism rates, or computer linguistic analysis are necessary at potential sentencing proceedings. Finally, the Defense failed to demonstrate how denial of expert assistance from a forensic psychologist would result in a fundamentally unfair trial for [Appellant].

. . . .

Additionally, the Defense has not identified any defense to the charged offenses in which scientific evidence or expert testimony, specifically in the field of forensic psychology, would be necessary. . . . [T]he Defense's devises [sic] justification is again, grounded in suggestion and possibility.

Appellant asserts that the military judge erred in deciding the motion. We disagree.

**2. Law**

We review a military judge's ruling on a motion to compel expert assistance for an abuse of discretion. *United States v. Anderson*, 68 M.J. 378, 383 (C.A.A.F. 2010) (citation omitted). "An abuse of discretion occurs when the trial court's findings of fact are clearly erroneous or if the court's decision is influenced by an erroneous view of the law." *United States v. Lloyd*, 69 M.J. 95, 99 (C.A.A.F. 2010) (citing *United States v. Freeman*, 65 M.J. 451, 453 (C.A.A.F. 2008)).

This "standard is a strict one, calling for more than a mere difference of opinion. The challenged action must be arbitrary, fanciful, clearly unreasonable, or clearly erroneous." *United States v. McElhaney*, 54 M.J. 120, 130 (C.A.A.F. 2000) (internal quotation marks and citations omitted). "When judicial action is taken in a discretionary matter, such action can not [sic] be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors." *Ellis*, 68 M.J. at 344 (internal quotation marks omitted) (citing *United States v. Sanchez*, 65 M.J. 145, 148 (C.A.A.F. 2007)).

[S]ervicemembers are entitled to . . . expert assistance when necessary for an adequate defense. The mere possibility of assistance is not sufficient to prevail on the request. Instead, the accused has the burden of establishing that a reasonable probability exists that (1) an expert would be of assistance to the defense and (2) that denial of expert assistance would result in a fundamentally unfair trial. To establish the first prong, the accused must show (1) why the expert assistance is needed; (2) what the

> expert assistance would accomplish for the accused; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop.

*Freeman*, 65 M.J. at 458 (alteration in original) (internal quotation marks and citations omitted).

### 3. Analysis

Appellant asserts on appeal expert assistance in forensic psychology would have helped him defend against a charge of attempt, specifically on the issue of Appellant's state of mind. Appellant argues that "[w]hether he truly believed that he was communicating with a 14-year-old girl is at the heart of the allegation against him."

Appellant states with this assistance he could have presented expert testimony explaining how "his requests for 'live pics'" and "frequently expressed doubts about her identity" in his chats "were evidence that he did not believe HALLEEEBUG's [sic] stated persona and thought she might be either a computer program or someone who was scamming him." Similarly, Appellant argues the expert could have educated the members on what language in the chats indicates that someone believes they are being lied to. "Accordingly, Dr. MD could have explained to the court-martial that, when [Appellant] was talking to HALEEEBUG, he likely believed that he was talking to a bot or otherwise being lied to."

An expert is not necessary to present or understand this evidence. A plain reading of the chats indicates Appellant was questioning "HALEEBUG's" identity; trial defense counsel could and did point out those areas to the members.

Appellant also argues the expert could have educated the members on why and how people lie in online conversations. Appellant notes Dr. MD testified that "websites or chat platforms that are used for sexual communication are known to be ripe for deception" and "users of such applications often expect that they are chatting to someone who is lying about who they are." Expert assistance in this area was not necessary. During voir dire in this case, the court members all agreed with trial defense counsel that they were generally familiar with the idea that someone can easily lie about themselves online, and that when meeting and communicating with someone online, individuals should be suspicious about the information they are being told. An exploration into why and how people lie during online conversations was not necessary for Appellant's defense in this case.

Moreover, assuming Appellant correctly characterizes "his state of mind" as an ultimate issue at trial, the expert witness would not have been permitted to express an opinion on whether Appellant "likely believed" he was being lied to or whether he believed "HALEEEBUG's" stated age. *See United States v.*

*Hays*, 62 M.J. 158, 165 (C.A.A.F. 2005) (citation omitted) (clarifying that Mil. R. Evid. 704 permits expert-witness testimony that embraces an ultimate issue, but "does not permit the expert to express an opinion on the 'ultimate issue' of a case").

The trial judge did not abuse his discretion when he denied the defense motion to compel expert assistance in the field of forensic psychology.

### III. CONCLUSION

The approved findings and sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court