# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

———————————

**No. ACM 39904**

———————————

**UNITED STATES**
*Appellee*

**v.**

**Holden T. WEBB**
Airman (E-2), U.S. Air Force, *Appellant*

———————————

Appeal from the United States Air Force Trial Judiciary

Decided 18 November 2021

———————————

*Military Judge*: Bryon T. Gleisner (arraignment); Andrew R. Norton.

*Sentence:* Sentence adjudged on 13 December 2019 by GCM convened at Wright-Patterson Air Force Base, Ohio. Sentence entered by military judge on 7 February 2020: Bad-conduct discharge, confinement for 335 days, reduction to E-1, and a reprimand.

*For Appellant:* Major David A. Schiavone, USAF; Captain Ryan S. Crnkovich, USAF.

*For Appellee*: Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before POSCH, RICHARDSON, and MEGINLEY, *Appellate Military Judges*.

Judge MEGINLEY delivered the opinion of the court, in which Senior Judge POSCH and Judge RICHARDSON joined.

———————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

———————————

MEGINLEY, Judge:

A general court-martial comprised of a military judge convicted Appellant, contrary to his pleas, of four specifications of willfully disobeying a superior commissioned officer, in violation of Article 90, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 890; two specifications of damaging non-military property, in violation of Article 109, UCMJ, 10 U.S.C. § 909; two specifications of assault consummated by battery against TA and two specifications of assault consummated by battery against VU, in violation of Article 128, UCMJ, 10 U.S.C. § 928; and one specification of aggravated assault by strangulation against TA, in violation of Article 128, UCMJ, 10 U.S.C. § 928.[1,2] The court-martial sentenced Appellant to a bad-conduct discharge, confinement for 335 days, reduction to the grade of E-1, and a reprimand. The military judge credited Appellant with 184 days against his sentence for time Appellant spent in military pretrial confinement. The convening authority took no action on the sentence.

Appellant raises six issues on appeal, which we have reordered: (1) whether the military judge's failure to define "unlawfully strangle" entitles Appellant to a dismissal of his conviction for aggravated assault, consistent with the rule of lenity; (2) whether one of his convictions for assault consummated by battery against TA, and his conviction for aggravated assault by strangulation against TA, are factually and legally insufficient; (3) whether this court should set aside Appellant's conviction for aggravated assault due to various pretrial processing issues; (4) whether Appellant's counsel was ineffective by acquiescing to the Government proceeding with the aggravated assault charge; (5) whether the military judge abused his discretion in allowing expert testimony regarding counterintuitive behaviors of domestic violence victims; and (6) whether the military judge abused his discretion in allowing the Government to introduce expert testimony in sentencing related to post-traumatic stress disorder.

On 12 August 2021, we issued an opinion affirming the findings and sentence. *United States v. Webb*, No. ACM 39904, 2021 CCA LEXIS 432 (A.F. Ct. Crim. App. 12 Aug. 2021) (unpub. op.). On 10 September 2021, Appellant

---

[1] All references to the UCMJ and Rules for Courts-Martial are to the *Manual for Courts-Martial, United States* (2019 ed.) (*MCM*).

[2] Appellant was charged with some offenses occurring before 1 January 2019; however, he was acquitted of those offenses. Those offenses include two specifications of willfully disobeying a superior commissioned officer, one specification of sexual assault, one specification of indecent visual recording, and one specification of communicating a threat, in violation of Articles 90, 120, 120c, and 134, UCMJ, 10 U.S.C. § 890, 920, 920c, and 934. Both TA and VU were active duty enlisted service members at the time of the offenses.

moved this court for reconsideration of our decision, which the Government opposed. We granted Appellant's motion on 6 October 2021 and withdraw our earlier opinion.

On reconsideration of our opinion, we again affirm the findings and sentence.

## I. BACKGROUND

Appellant met TA, the victim of most offenses in this case, in May 2018. They became friends and by October 2018, their relationship progressed into a sexual relationship, or as TA described it, "friends with benefits." TA and Appellant did not tell others about their relationship; it was important to TA that "[n]obody knew that [they] were anything other than friends," as TA "had previously had a relationship in the office that didn't go over so well when it was well known or out there."

Although TA was in a sexual relationship with Appellant, she was also rekindling a relationship she previously had with Airman (Amn) CE. Appellant found out about this other relationship after a squadron Christmas party on 8 December 2018. When he found out TA might be physically with Amn CE, Appellant had his roommate, VU, drive him to base. Once on base, Appellant obtained a recall roster from work, found Amn CE's address, and looked for TA and Amn CE. Appellant was unsuccessful in finding TA or Amn CE, but later confronted Amn CE via text message to let him know Appellant and TA were in a relationship.

TA advised a former supervisor that she wanted to repair her relationship with Amn CE, and that Appellant's revelations about their relationship were disrupting those efforts. TA was also concerned about Appellant's possessing pictures of a sexual nature of TA (taken consensually), and told her supervisor that Appellant had threatened to send these pictures to Amn CE. At trial, TA testified that Appellant never made this threat to send pictures.

Upon learning about TA's allegation, on 10 December 2018 Appellant's commander, Colonel (Col) RT, issued a no-contact order to Appellant to cease communications with TA. On 21 December 2018, Col RT issued a formal Military Protective Order (MPO), which precluded Appellant from contacting or being within 500 feet of TA.[3] Appellant repeatedly violated Col RT's MPO by communicating with TA and by being within 500 feet of her. When TA made her allegation, an investigation began that resulted in a lengthy Report of Investigation (ROI) involving allegations of sexual assault, the violation of no

---

[3] The MPO replaced the 10 December 2018 no-contact order.

contact orders, damaging non-military property, indecent recording, assault, and communicating a threat.

On 14 January 2019, TA learned she had become pregnant with Appellant's child. TA's upcoming deployment was cancelled, and because she had moved out of her home due to the pending deployment, TA moved in with Appellant and VU. Meanwhile, TA advised Col RT "that she was pregnant and that [Appellant] was the father and she wanted him involved in the prenatal care and the postnatal care and said that she had planned on moving in with [Appellant's] mother." Accordingly, on 29 January 2019, Col RT rescinded the 21 December 2018 MPO.

While TA and Appellant were living with VU, on one night after Appellant had been drinking, he assaulted VU by repeatedly punching him in the head and forearms. Appellant then grabbed VU by the wrist and pushed him into the wall, leaving a hole in the wall. Subsequently, VU asked TA and Appellant to move out of his house. TA and Appellant moved in with Appellant's mother, who lived nearby.

On 25 February 2019, Appellant found out TA had engaged in communication with her ex-husband. This led to another argument, during which Appellant took TA's phone and refused to return it. TA tried to retrieve her phone, but Appellant repeatedly assaulted TA by pushing her. Appellant then locked himself in a bathroom with TA's phone. Appellant's mother, who was in the house at the time, came to see what was going on and called for Appellant's brother, DW, to assist. Appellant opened the bathroom door, pinned TA against the wall, and threw her into a spare bedroom. Appellant and TA moved to the front of the house; he then threw TA outside, locked her out of the house, and again refused to give TA her phone despite her continued requests. DW called the police and Appellant was arrested. According to TA, Appellant's mother told TA to "get out of [her] house and never come back." TA moved into a rental property a few days later. TA stated this was the first time Appellant had been violent toward her. Upon learning about this incident, on 28 February 2019, Col RT issued a new MPO against Appellant.

On an evening in March 2019, Appellant assaulted TA by strangling her, and later picked her up and dropped her on the ground; the facts of both of these incidents are outlined in greater detail in conjunction with our analysis below. Even though TA was aware of the existence of the no-contact orders and MPOs, and although she had been physically assaulted by Appellant on two occasions, she continued to have daily communication with Appellant by text message, Snapchat, and in person.

During the next few months, Appellant continued to monitor some of TA's activities and conversations by checking her phone when she was with him.

Appellant also caused damage to TA's residence by breaking a door and punching a hole through the wall. When asked by trial counsel how Appellant would treat TA after these incidents of physical violence and property damage, TA stated: "[Appellant] would apologize. Tell me it would never happen again, that he loved me, that he cared about me. And he would generally do something to make me happy like, get me dinner, or buy me candy, or buy me ice cream or something like that." Eventually, Appellant was discovered at her house and subsequently restricted to base. TA visited him on Memorial Day weekend in 2019; however, when she attempted to leave and visit her family, Appellant would not let her leave. TA attempted to call security forces but Appellant took her phone and ended the call. After this incident, TA tried to end her relationship with Appellant. She began to cooperate with agents of the Air Force Office of Special Investigations (AFOSI) and eventually disclosed details about her relationship with Appellant. Due in part to the information provided by TA, Appellant was ordered into pretrial confinement on 12 June 2019, where he remained until trial.

## II. DISCUSSION

### A. Definition of Strangulation

Specification 4 of Charge V alleged that Appellant "unlawfully strangled" TA. Appellant argues that because "unlawfully strangled" is not defined in the text of the statute or the Manual for Courts-Martial, and because there was no colloquy between the military judge and the parties on the definition of strangulation, the rule of lenity entitles Appellant to a dismissal of this specification. Appellant specifically points this court to the closing arguments by trial counsel and trial defense counsel and the different standards and multiple interpretations both sides applied. Appellant also claims because "strangulation" is not defined, the military judge should have discussed the definition of the term with the parties, which he did not. Additionally, Appellant argues that the force allegedly applied in this case was of "such minimal degree that the named victim said she could still 'talk' and 'breathe'" when Appellant had his hands around TA's neck, and thus was not clearly strangulation. We find no relief is warranted.

#### 1. Additional Background

During closing argument, trial counsel argued:

> [Appellant] got into an argument with [TA]. He put his hands around her throat and he squeezed. He strangled her, sir. The strangulation is but one element in the 2019 version, sir. Did he put his hands around her neck and squeeze? Yes, he strangled her. Done.

5

This doesn't require a lack of inability [sic] to breathe. It doesn't require passing out. It doesn't require any of those things that were required when there is an aggravated assault statute. The strangulation statute has lowered the burden on the government. It's one element, sir and that's he put his hands around her neck and he strangled her.

In response, trial defense counsel stated:

[W]hat strangulation means is that it's the impeding the normal breathing and circulation of the blood of a person by applying pressure to the throat or neck. But what did [TA] testify to? She testified that she could breathe; that she could talk; that she never lost consciousness; that the -- even to OSI she said that -- in her trial testimony, she said the thumbs were wrapped around the front of her neck.

But then what she told OSI is that she felt the pressure on the side of her neck. There has been no evidence presented before this court then that there was the impeding of her normal breathing. Because she said she could still breathe, she could still talk, she never passed out. The government -- there has been no evidence presented to this court that it inhibited the circulation of blood. The government would ask the court to infer that that would be the case.

On rebuttal, trial counsel responded:

You heard there was a squeeze on the jugular and carotid arteries and that made her lightheaded and dizzy. Everyone has had that experience. Perhaps when they tie their tie too tight and leaned forward. You've had that experience. I've had that experience. It's -- that is the impediment of blood to the brain. That's what she felt and that's all that's required for this specification, Your Honor. Not actual choking. Not actual passing out or the inability to breathe or communicate. The obstruction of breathing or disjunctive normal circulation. That's what happened.

### 2. Law on Strangulation

As part of the National Defense Authorization Act for Fiscal Year 2019, Article 128(b), UCMJ, was amended to include "strangulation" and "suffocation" as "conduct constituting aggravated assault for purposes of the Uniform Code of Military Justice." Pub. L. No. 115-232, § 531, 132 Stat. 1636 (13 Aug. 2018). This amendment to Article 128, UCMJ, took effect on 1 January 2019. *Id.* at § 531(b). Article 128(b)(3), *Aggravated Assault*, UCMJ, now states that

"[a]ny person subject to this chapter . . . who commits an assault by strangulation or suffocation; is guilty of aggravated assault and shall be punished as a court-martial may direct." *See Manual for Courts-Martial, United States* (2019 ed.) (*MCM*), App. 2, at A2-45.[4]

"Strangulation" is not defined in the text of the statute or the *MCM*. However, Appendix 17 of the *Manual for Courts-Martial*, *Analysis of Punitive Articles*, notes that two amendments to Article 128, UCMJ, are aligned "more closely with federal civilian practice under 18 U.S.C. § 113." *See MCM*, App. 17, at A17-13. Section 113 of Title 18 of the United States Code, *Assaults with maritime and territorial jurisdiction*, defines "strangling" as "intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of a person by applying pressure to the throat or neck, regardless of whether that conduct results in any visible injury or whether there is any intent to kill or protractedly injure the victim . . . ." 18 U.S.C. § 113(b)(4).

An issue of statutory construction is a question of law we review de novo. *United States v. Wilson*, 76 M.J. 4, 6 (C.A.A.F. 2017) (citing *United States v. Atchak*, 75 M.J. 193, 195 (C.A.A.F. 2016)). "Unless ambiguous, the plain language of a statute will control unless it leads to an absurd result." *United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012) (citing *United States v. Lewis*, 65 M.J. 85, 88 (C.A.A.F. 2007)). "Whether the statutory language is ambiguous is determined 'by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Any ambiguity should be resolved in favor of lenity. *United States v. Murphy*, 74 M.J. 302, 311 (C.A.A.F. 2015) (citing *Cleveland v. United States*, 531 U.S. 12, 25 (2000)) (additional citations omitted).

"[T]he rule of lenity's teaching [is] that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor." *United States v. Davis*, "___ U.S. ___, 139 S. Ct. 2319, 2333 (2019). "[M]uch like the vagueness doctrine, it is founded on 'the tenderness of the law for the rights of individuals' to fair notice of the law 'and on the plain principle that the power of punishment is vested in the legislative, not in the judicial department.'" *Id.* (quoting *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95 (1820) (additional citation omitted)). Resorting to the rule of lenity, however, is reserved for those situations in which "[a]fter 'seiz[ing] everything from which aid can be derived,'

---

[4] The first appearance of "strangulation" and "suffocation" appears in the *MCM*, pt. IV, ¶ 77.a.(b), which states, "NOTE: For additional statutory language of 'strangulation' and 'suffocation,' added as part of the FY19 NDAA, *See* Appendix 2, Article 128(b), UCMJ[.]"

[the court is] left with an ambiguous statute." *United States v. Bass*, 404 U.S. 336, 347 (1971) (second alteration in original) (quoting *United States v. Fisher*, 6 U.S. (2 Cranch) 358, 386 (1805) (footnote omitted)).

### 3. Analysis and Conclusion

Prosecutors long have been able to charge allegations involving strangulation as an assault under Article 128, UCMJ. The only difference now is that aggravated assault by strangulation has its own charging mechanism. The Government still has to prove an assault—that Appellant attempted, offered, or did bodily harm to TA. The most substantial change in cases alleging strangulation is that now, the Government is alleviated from having to prove an appellant inflicted substantial bodily or grievous bodily harm. This is important to note because Appellant asks this court to consider other definitions of strangulation that focus on what appear to be versions of substantial or grievous bodily harm, directing us to a Kansas Supreme Court case, *State v. Robinson*, 306 Kan. 431, 439 (2017), where that court stated, "In the context of legal usage, strangling does not require death but simply an *attempt* to shut off a victim's air supply." (Emphasis added). Appellant also directs us to Merriam-Webster's dictionary, which defines strangling as "to choke to death by compressing the throat with something (such as a hand or rope)" or "to obstruct seriously or fatally the normal breathing of." MERRIAM-WEBSTER, *Strangle*, https://www.merriam-webster.com/dictionary (last visited 13 May 2021).

We decline to accept Appellant's position, nor do we believe we must resort to the rule of lenity in this case. In light of the fact that substantial or grievous bodily harm is not an element to prove aggravated assault by strangulation, we believe the definition as listed under 18 U.S.C. § 113 accurately describes the current state of the law in the absence of a presidential executive order otherwise. Additionally, although the parties did not discuss the definition of "strangle" during trial, Appellant's court-martial consisted only of a military judge and the military judge is "presumed to know the law and to follow it absent clear evidence to the contrary." *United States v. Erickson*, 65 M.J. 221, 225 (C.A.A.F. 2007) (citing *United States v. Mason*, 45 M.J. 483, 485 (C.A.A.F. 1997)). There is no such evidence suggesting the military judge did not follow the law. We are confident the law and the record provide enough clarity of the offense charged, and that we can conduct a review of legal and factually sufficiency.

## B. Legal and Factual Sufficiency (Specifications 3 & 4 of Charge V)

Appellant asserts that the evidence for Specifications 3 and 4 of Charge V (the March 2019 assaults of TA), for which he was convicted, is legally and factually insufficient. We disagree.

### 1. Additional Background

According to TA's testimony, the allegations levied in Specifications 3 and 4 occurred on the same night; Specification 4 occurred before Specification 3. Specification 4 alleged that Appellant "unlawfully strangled" TA's neck with his hands; Specification 3 alleged that Appellant picked up TA with his hands and dropped her to the ground.[5]

The Government's primary evidence of these allegations came from TA and a Snapchat text message discussion between TA and Appellant. In March 2019, Appellant drove to TA's residence. While there, Appellant became very drunk, to the point he was stumbling and falling over. An argument between TA and Appellant ensued and Appellant wanted to leave the residence. In order to prevent Appellant from driving in his intoxicated state, TA took away his keys. Appellant kept asking for his keys back, but TA would not return them to Appellant. The argument escalated when Appellant put his hands around TA's throat and strangled her. TA testified about the strangulation as follows:

> Q [Trial Counsel]. When he puts his hands around your neck, do you just stand there or do you move somewhere?
>
> A [TA]. He pushes me into the couch to where I'm laying on the couch, half of -- my upper body is on the seated part of the couch and my lower body is on the floor.
>
> Q. Can you describe for [the military judge], how he had his hands around your neck?
>
> A. He had his hands around my neck with both hands, thumbs in front, and pressing down.
>
> Q. Can you show [the military judge]?
>
> A. Like this.
>
> Q. The witness has put her hands together with her fingers adjacent to each other and interlocking around the thumbs. When he had his hands around your neck like that, you said he squeezed?
>
> A. Yes.
>
> Q. I know it's hard to judge these times -- these types of things, but with how much force did he squeeze?
>
> A. I -- I could talk because I managed -- I said the word stop -- or, I said, please stop. But -- so I know that I could breathe, but

---

[5] Appellant was sentenced to 30 days in confinement for Specification 3 and 150 days for Specification 4, each to be served consecutively to all other terms of confinement.

> I remember staring at the ceiling and getting dizzy and thinking I'm going to die.
>
> Q. What did the dizzy feeling feel like?
>
> A. That I would pass out but I could still breathe and ----.
>
> Q. Did you start to see stars?
>
> A. A little bit. I thought that maybe if I could let myself pass out that I would be able to breathe though.

TA testified Appellant had his hands on her neck "for 30 seconds to a minute." TA then stated that Appellant let go of her neck when he "passed out," then clarified that "he didn't fully pass out, but he was going to pass out from being drunk and like, fell onto the ground." When trial counsel asked what TA was doing with her hands while Appellant was squeezing her throat, TA stated, "I had my hands over his trying to pull them off, but I remember not feeling like I could do anything else." On cross-examination, TA reiterated that Appellant put his hands around her throat, but testified she could still breathe, talk, and she never lost consciousness. TA also acknowledged she told AFOSI agents that when Appellant's hands were on her neck, the pressure was on the sides.

When Appellant came to, he still wanted his keys. TA was in her living room and Appellant started walking toward her, came up to her, and pinned her arms against her head next to her ears. TA testified:

> He had gotten behind me and walked me backwards to the point where he was sitting down on a chair and when he had sat down, I had kneeled down in front of him, still with my arms pinned. And he was telling me to give me back his keys. I told him that I wasn't giving him back his keys and I also said I can't give you your keys with my arms like this. So he had let go of my arms and then at that point, we were still sitting down so I kind of fell forward onto the floor. Now I'm on all fours, hands and knees and crawled forward. He then stood up and picked me up by the back of my pants. Picked me up to about chest height and dropped me on the ground.

TA stated she had hardwood floors, and when Appellant dropped her, it hurt. After he assaulted her, Appellant fell asleep on the couch. TA later woke him up and told him to go to bed.

The next day, Appellant told TA "he was really sorry and he'd never do it again, that he cares about [TA], that he loves [TA], and that he doesn't remember it, that he was drunk, and he promises he wouldn't do it again." In Snapchat messages between Appellant and TA, the following exchange occurred:[6]

> Appellant: [TA] I'm sorry I know I can't ever take them back but please give me another chance to prove those wrong
>
> TA: Prove what wrong, you being shitty to me since February when the cops got called
>
> Appellant: Just please give me another chance I will prove all that wrong
>
> TA: And you'll never lay a hand on me again?
>
> Appellant: No never
>
> TA: But why did you
>
> Appellant: [TA] I never wanted to the first time I just felt betrayed and the second time I didn't even remember
>
> TA: You were so drunk that you don't remember? Cause I told you that you put your hands around my neck and you justified it with "it wasn't hard" but it was. So do you really not remember?
>
> Appellant: Like I remembered after you told me but during the time I didn't know what I was doing
>
> TA: All cause I wouldn't let you drive home drunk
>
> TA: And you picked me up by the back of my pants after holding me down, I was crawling away and you picked me up and dropped me on the floor
>
> TA: I don't wanna be with someone that I don't know if they're going to hurt me or not when they're drunk

---

[6] The Snapchat messages, presented verbatim without correction and as admitted into evidence, indicate TA was having a conversation with someone listed in her phone as "Dylan Tyler." However, TA testified Appellant contacted her with a false name/account of "Dylan Tyler." TA further stated that she knew she was talking to Appellant because Appellant told her that the messages were from him. TA also explained that Appellant used a false name because "law enforcement had already had our phones once and they would most likely go through [them] again," and because the military protective order was still in effect. These messages were admitted without objection by the Defense.

> Appellant: [TA] by no means was it alright but you've drank with me numerous times I'm not ever really like that
>
> TA: Not ever "really" like that but the past couple times you hurt me at my house, then made me walk home from [friend's] and then called me a whore in your dorm and I left.
>
> TA: Those were all the past few times we drank
>
> Appellant: Yes I understand but we've had good drinking times in between . . .

TA was the only Government witness with direct knowledge of Specifications 3 and 4. Appellant asserts that she was not a credible witness, given her "penchant for lying."

We are not persuaded and find Appellant's convictions both legally and factually sufficient.

**2. Law on Legal and Factual Sufficiency**

We review issues of legal and factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990)). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The "government is free to meet its burden of proof with circumstantial evidence." *Id.* (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are ourselves] convinced of the [appellant]'s guilt beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987). "In conducting this unique appellate role, we take 'a fresh, impartial look at the

evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399).

### 3. Analysis and Conclusion

The elements of Specification 4 of Charge V alleging aggravated assault by strangulation, in violation of Article 128, UCMJ, include: (1) that at the time and place alleged, Appellant wrongfully assaulted TA; and (2) that Appellant did so by strangling TA's neck with his hands. We make this determination after a review of the charged specification and the language in 10 U.S.C. § 928, which states that one "who commits an assault by strangulation or suffocation" commits an aggravated assault. *See MCM*, App. 2, at A2-45. We do not require a pronouncement from the President.[7]

The elements of Specification 3 of Charge V alleging assault consummated by battery, in violation of Article 128, UCMJ, of which Appellant was convicted, include: (1) that at the time and place alleged, Appellant did bodily harm to TA; (2) that the bodily harm was done by unlawfully picking up TA with his hands and dropping her on the ground; and (3) that the bodily harm was done with unlawful force or violence. *See MCM*, pt. IV, ¶ 77.b.(2).

Appellant argues TA's lack of credibility renders these two specifications legally and factually insufficient. We agree TA had some credibility issues; the record, as well as her own in-court testimony, showed that TA lied to multiple individuals and authorities about various aspects of her allegations and about her relationship with Appellant. This included admissions, under oath, that TA lied to defense counsel during one of their interviews and lied to AFOSI agents about the details of her sexual assault allegation. Appellant also notes TA was inconsistent regarding where on TA's throat Appellant was pressing when he strangled her.

However, Appellant fails to appreciate the significance of the Snapchat messages. Those messages, and this part of the exchange in particular, corroborate TA's testimony about what happened on this particular night in March 2019:

> TA: You were so drunk that you don't remember? Cause I told
> you that you put your hands around my neck and you justified

---

[7] "Of course, while the views . . . of the President in promulgating [Manual provisions] are important, they are not binding on this Court in fulfilling our responsibility to interpret the elements of substantive offenses." *United States v. Mance*, 26 M.J. 244, 252 (C.M.A. 1988).

> it with "it wasn't hard" but it was. So do you really not remember?
>
> Appellant: Like I remembered after you told me but during the time I didn't know what I was doing

Applying the plain meaning of "strangling" and the definition in 18 U.S.C. § 113(b)(4), *supra*, we find Appellant's conviction for aggravated assault by strangulation to be legally and factually sufficient. The mere fact that TA could still breathe and talk does not mean Appellant did not commit the charged conduct. TA's testimony indicates that Appellant, at a minimum, recklessly impeded her normal breathing or circulation of the blood by applying pressure to her throat; TA testified she became "dizzy," started seeing stars, and commented that "I thought that maybe if I could let myself pass out that I would be able to breathe though." Furthermore, while there were some inconsistencies in her testimony about exactly where Appellant was applying force to her neck, TA was consistent that Appellant's hands were around her neck—which is direct evidence of the means by which Appellant strangled TA. She also demonstrated for the military judge how Appellant had his hands around her neck, as she "put her hands together with her fingers adjacent to each other and interlocking around the thumbs." Viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty of both the elements of the offense beyond a reasonable doubt and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction for Specification 4 of Charge V both legally and factually sufficient.

We also find Appellant's conviction for assault consummated by battery, as reflected in Specification 3 of Charge V, to be legally and factually sufficient. During closing argument, trial defense counsel stated, based on TA's description of what happened, "Yet [Appellant] is somehow able to lift her to a 90 [degree] angle with one arm and then drop her. That doesn't make sense." We disagree. TA testified that in February 2019, she weighed "90 pounds at most" and was four feet, eleven inches tall. Furthermore, the military judge had the opportunity to observe Appellant's physical presence in relation to that of TA.[8] We believe it is rational for the military judge, based on in-court observations, to conclude that Appellant would have been able to pick TA up and drop her as

---

[8] Additionally, in closing argument, the Defense stated, "Now [Appellant] is strong -- is tall." We also note that Appellant's sentencing exhibits include pictures of Appellant; he was 20 years old at the time of the incidents, and had played football in high school.

she described. Again, viewing the evidence in the light most favorable to the Prosecution, we find that a rational factfinder could have found Appellant guilty of both the elements of the offense beyond a reasonable doubt and that the evidence is legally sufficient to support Appellant's conviction. Having weighed the evidence in the record and made allowances for not having personally observed the witnesses, we also conclude the evidence is factually sufficient and are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's conviction for Specification 3 of Charge V both legally and factually sufficient.

## C. Preferral and Referral Issues Related to Specification 4 of Charge V (Aggravated Assault)

### 1. Additional Background

Appellant asserts numerous issues regarding the pretrial processing of Specification 4 of Charge V. That specification, as referred, reads, "In that [Appellant] did, at or near Dayton, Ohio, between on or about 1 March 2019 and on or about 31 March 2019, unlawfully strangle [TA's] neck with his hands." Specifically, Appellant argues (1) that trial counsel did not have the authority to prosecute him for aggravated assault because the specification at issue mirrored the model specification for assault consummated by a battery; (2) the specification made no statutory reference to aggravated assault; (3) the staff judge advocate's pretrial advice told the convening authority that Appellant had only been charged with assault consummated by a battery; and (4) the convening authority made no indication that he intended to refer anything other than that which his staff judge advocate advised him to refer. Appellant's counsel further argues that (1) Appellant's conviction for aggravated assault "cannot stand for the plain and simple fact that this specification was never referred to trial," and (2) "what occurred is not akin to a 'major/minor change' pursuant to [Rule for Courts-Martial (R.C.M.)] 603, and the Government cannot claim safe harbor under such a theory."[9]

Charges were preferred on 12 July 2019 and Appellant waived the Article 32, UCMJ, 10 U.S.C. § 832, preliminary hearing on 18 July 2019. On 23 July 2019, the general court-martial convening authority's staff judge advocate (SJA) provided his written pretrial advice in accordance with Article 34, UCMJ, 10 U.S.C. § 834. In this memorandum, the SJA advised the convening authority that Appellant had been "charged with . . . one charge and *six specifications of assault consummated by a battery* in violation of Article 128, UCMJ." (Emphasis added). Appellant rightfully asserts that the pretrial advice did not mention Appellant was charged with aggravated assault. Although

---

[9] R.C.M. 603 provides guidance on major and minor changes.

Appellant signed a receipt for the pretrial advice on 24 July 2019, his counsel signed a receipt for the pretrial advice on 1 March 2020, nearly three months after the conclusion of Appellant's trial.

During Appellant's arraignment on 29 July 2019, trial counsel correctly announced the general nature of the charges as follows:[10]

> [S]ix specifications of willfully disobeying a superior commissioned officer in violation of Article 90, UCMJ; two specifications of damaging nonmilitary property, in violation of Article 109[,] UCMJ; one specification of sexual assault, in violation of Article 120, UCMJ; one specification of indecent visual recording, in violation of Article 120c, UCMJ; five specifications of assault consummated by battery *and one specification of aggravated assault by strangulation*, in violation of Article 128[,] UCMJ; and one specification of communicating a threat, in violation of Article 134, UCMJ.

(Emphasis added.)

On 3 September 2019, before a new military judge and prior to a motions hearing, trial counsel announced the general nature of the charges included "six specifications of assault consummated by a battery, in violation of Article 128[,] UCMJ." On 9 December 2019, prior to the start of Appellant's trial, trial counsel reverted back to how the general nature of the charges were originally described at the first Article 39(a), UCMJ, session: "five specifications of assault consummated by battery and one specification of aggravated assault by strangulation, all in violation of Article 128, UCMJ."

While the military judge did not discuss the maximum available punishments with the parties, the parties alluded to those maximum punishments. During sentencing argument, trial counsel asked the military judge to sentence Appellant to two years of confinement for the strangulation offense. Trial defense counsel did not object, although no more than six months of confinement was authorized for assault consummated by a battery without an aggravating sentencing factor. *See MCM*, pt. IV, ¶ 77.d.(2)(a). In its argument on sentence, the Defense told the military judge, "You know the facts of the case and you know the range of punishments available for strangulation."

Appellant advises this court that his trial defense counsel, as well as TA's Special Victim's Counsel (SVC), were confused about the nature of the charges. Specifically, trial defense counsel stated, through their motions, that Appellant

---

[10] Appellant waived the statutory five-day waiting period of Article 35, UCMJ, 10 U.S.C. § 835.

had been "charged with . . . one charge and six specifications of assault consummated by battery, in violation of Article 128, UCMJ," and TA's "Input on [the] Defense Offer of Plea Agreement" did not refer to the strangulation specification as an aggravated assault.[11] Appellant also states that the word "aggravated" appeared only once during the litigated trial, when trial counsel was giving his closing argument.

Trial defense counsel never objected to nor sought clarification on the nature of the charges. Appellant raises this issue for the first time on appeal.

### 2. Law and Analysis

#### *a. Pretrial Advice*

"Whether a specification is defective and the remedy for such error are questions of law, which we review de novo." *United States v. Ballan*, 71 M.J. 28, 33 (C.A.A.F. 2012) (citations omitted). "The convening authority may not refer a specification under a charge to a general court-martial unless . . . [t]he convening authority has received the advice of the staff judge advocate required under R.C.M. 406 and Article 34(a)[, UCMJ, 10 U.S.C. § 834(a)]." R.C.M. 601(d)(2)(B).

Any "[d]efenses or objections based on defects (other than jurisdictional defects) in the preferral, forwarding, or referral of charges, or in the preliminary hearing" must be raised before a plea is entered. R.C.M. 905(b)(1). "Failure by a party to raise defenses or objections or to make motions or requests which must be made before pleas are entered under subsection (b) of this rule forfeits the defenses or objections absent an affirmative waiver." R.C.M. 905(e)(1).

In *United States v. Murray*, 25 M.J. 445, 446–447 (C.M.A. 1988), a case where the convening authority was not provided written pretrial advice, the court opined that "(1) It is error not to submit the charges to the staff judge advocate in order for him to render, in writing, a pretrial advice; (2) Failure to obtain the pretrial advice can be prejudicial to an accused; and, (3) Such an error is not jurisdictional in nature." The court in *Murray* also stated, "We are convinced that Congress never intended -- either specifically or by logical inference -- to make an Article 34 violation *per se* prejudicial or to require automatic reversal." *Id*. at 449. The court held "that an error such as the one before us now requires reversal only when the accused has suffered *actual prejudice*." *Id*. at 447 (emphasis added) (citations omitted). Consistent with our superior court's opinion in *Murray*, we find there was no jurisdictional defect in the pretrial advice in this case.

---

[11] Appellant submitted an offer for plea agreement on 24 September 2019. That same day, the convening authority disapproved the offer.

Appellant claims two errors related to the SJA's pretrial advice to the convening authority regarding the specification at issue: the pretrial advice related that Appellant had been charged with assault consummated by a battery, and the convening authority made no indication that he intended to refer anything other than that which his SJA advised him to refer in that advice. While the pretrial advice did not indicate that the charged conduct was an aggravated assault, it contained all of the information required by R.C.M. 406. It correctly stated that the charges and specifications were "generally in proper form," and that they "alleged offenses under the UCMJ." R.C.M. 406(c) requires a copy of the pretrial advice to be served on the defense.[12]

Objections to defects in the preferral, forwarding, investigation, or referral of charges must be raised before pleas are entered or they are forfeited absent an affirmative waiver. R.C.M. 905(b)(1), (e). Finding no affirmative waiver, we find Appellant forfeited this issue. We analyze such forfeited claims for plain error. *United States v. Zegarrundo*, 77 M.J. 612, 613 (A.F. Ct. Crim. App. 2018) (citations omitted). "To prevail under a plain error analysis, [an appellant] must persuade this Court that: '(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right.'" *United States v. Scalo*, 60 M.J. 435, 436 (C.A.A.F. 2005) (quoting *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000)) (additional citation omitted).

We find the SJA clearly erred when he described the charged conduct in the specification at issue as an assault consummated by a battery. Nonetheless, Appellant has not demonstrated prejudice. The pretrial advice is not equivalent to a charging document. Further, Appellant has failed to show, in this judge-alone case, that the result of his court-martial would have been different had the pretrial advice referenced a specification of aggravated assault. Appellant indeed concedes that "there is little question that the military judge convicted [him] of aggravated assault." Finally, the military judge sentenced Appellant to 150 days for this offense, below the maximum possible punishment of six months' confinement for assault consummated by a battery. We find Appellant was not prejudiced by this error.

### b. Notice of Offense

Appellant also asserts that trial counsel did not have the authority to prosecute him for aggravated assault because "the specification at issue mirrored the model specification for assault consummated by a battery," the specifica-

---

[12] The record of trial contains a Memorandum for Record that the SJA's pretrial advice was served on the accused on 24 July 2019; the record does not indicate why trial defense counsel receipted for the pretrial advice three months after the court-martial ended.

tion made no statutory reference to aggravated assault, and the convening authority referred the specifications as outlined in the pretrial advice, none of which were identified in writing as an aggravated assault.

We glean from this portion of the assignment of error that Appellant is essentially arguing that he was not on notice that he had to defend against an aggravated assault allegation. However, "[t]he military is a notice pleading jurisdiction." *United States v. Fosler*, 70 M.J. 225, 229 (C.A.A.F. 2011) (citation omitted). "A charge and specification will be found sufficient if they, first, contain[ ] the elements of the offense charged and fairly inform[ ] a defendant of the charge against which he must defend, and, second, enable[ ] him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Id.* (alterations in original) (internal quotation marks and citations omitted). "The rules governing court-martial procedure encompass the notice requirement: 'A specification is sufficient if it alleges every element of the charged offense expressly or by necessary implication.'" *Id.* (quoting R.C.M. 307(c)(3)).

We find Appellant was on notice that he was being charged with aggravated assault. First, prior to the entry of his pleas at his court-martial, trial counsel advised the court that the general nature of the charges included one specification of aggravated assault; the Defense did not object or raise an issue or motion on the record regarding that notice. Second, based on the Defense's cross-examination of TA together with the Defense's closing argument, it is clear that trial defense counsel knew they were defending an aggravated assault specification. In fact, trial defense counsel mentioned "the new law" during his closing argument, clearly referencing strangulation as conduct constituting aggravated assault. Third, trial defense counsel did not seek clarification when the Prosecution argued for 18 months more confinement than was authorized for the offense of assault consummated by a battery without the aggravating sentencing factor of strangulation. Next, we are confident that the words used in the specification read together with the description of aggravated assault by strangulation in the UCMJ were adequate to inform Appellant of the allegation against which he had to defend. Finally, Appellant claims TA's input on the Defense Offer of Plea Agreement evidenced confusion about the strangulation specification. However, the Offer of Plea Agreement, dated 24 September 2019, indicates that trial defense counsel were aware that this specification charged aggravated assault by strangulation. The terms of the offer to plead guilty to this specification—minimum confinement of nine months and possibility of dishonorable discharge—would be lawful punishments for aggravated assault but would not be lawful punishments for assault consummated by a battery. *See MCM*, App. 12, at A12-6.

Like the elements, the President has not issued guidance on a "model specification" for aggravated assault by strangulation, and while such guidance can

be useful, it is not necessary for our court to resolve this AOE. Specification 4 alleged that Appellant *unlawfully strangle*d TA *with his hands on her neck*. Thus, both assault and strangulation as delineated by Congress in the statute were included in the specification. Finally, while the specification made no reference to aggravated assault, none was required to apprise Appellant of the charged wrongdoing because it is clearly explained in the statute. We find Appellant was on notice, that the specification as preferred is legally sufficient, and that the convening authority properly referred the specification alleging aggravated assault to trial by general court-martial.

## D. Allegations of Ineffective Assistance of Counsel

Alternatively, Appellant argues the following:

> [I]f the record is accurate, then Appellant's defense counsel were not provided with the pretrial advice until three weeks after the entry of judgment was signed. Defense counsel's lack of objection would, therefore, be excused by the Government's R.C.M. 701 violation. [However], if the record is inaccurate and defense counsel were previously provided with the Pretrial Advice at the appropriate time (or this Court believes that defense counsel were obligated to file a motion to compel in order to obtain the Pretrial Advice), then Appellant was prejudiced as a result of their ineffective assistance.

Having found that the Defense forfeited the issue of pretrial advice, we will examine whether Appellant received ineffective assistance of counsel and was prejudiced thereby.

### 1. Law on Ineffective Assistance of Counsel

The Sixth Amendment[13] guarantees an accused the right to effective assistance of counsel. *United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)). In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See United States v. Gilley*, 56 M.J. 113, 124 (C.A.A.F. 2001) (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). "[O]ur scrutiny of a trial defense counsel's performance is 'highly deferential,' and we make 'every effort . . . to eliminate the distorting effects of hindsight,

---

[13] U.S. CONST. amend. VI.

to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (omission in original) (quoting *Strickland*, 466 U.S. at 689).

We will not second-guess reasonable strategic or tactical decisions by trial defense counsel. *Mazza*, 67 M.J. at 475 (citation omitted). "Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citing *Gooch*, 69 M.J. at 362–63). The burden is on the appellant to demonstrate both deficient performance and prejudice. *Id.* (citation omitted).

We consider the following questions to determine whether the presumption of competence has been overcome: (1) if appellant's allegations are true, is there a reasonable explanation for counsel's actions; (2) if appellant's allegations are true, did defense counsel's level of advocacy fall measurably below the performance ordinarily expected of fallible lawyers; and (3) if defense counsel was ineffective, is there a reasonable probability that, absent the errors, there would have been a different result. *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991) (citations omitted); *see also Gooch*, 69 M.J. at 362.

### 2. Analysis and Conclusion

In Appellant's case, we look to the language of R.C.M. 701, which states: "As soon as practicable after service of charges under R.C.M. 602, trial counsel shall provide the defense with copies of . . . [a]ll papers that accompanied the charges when they were referred to the court-martial . . . ." R.C.M. 701(a)(1)(A). The Record of Trial contains a receipt from *Appellant* acknowledging that he received the pretrial advice, the charge sheet, and the convening order. The record contains no indication that trial defense counsel notified the Prosecution of failure to receive these documents before trial, or moved the military judge for appropriate relief. We are hard-pressed to find Appellant's trial defense counsel ineffective for not receiving a document from the Government that Appellant already personally received.[14]

We also decline to find that trial defense counsel "acquiesced" to a charge of aggravated assault, as to suggest trial defense counsel "rolled over" to the Government. As we find no merit in Appellant's assignment of error regarding pretrial or notice matters, we find his trial defense counsel were not ineffective

---

[14] The Government submitted a motion to compel declarations or affidavits from Appellant's trial defense counsel on the issue of pretrial advice. This court denied the request, finding such a declaration or affidavit to be unnecessary because Appellant was provided the pretrial advice.

for failing to raise the issue at trial. We find Appellant was provided effective assistance of counsel.

## E. Admissibility of Expert Testimony

Appellant argues that the military judge abused his discretion in allowing the Government to present the expert testimony of Dr. MC, a forensic psychologist, during findings and sentencing. During findings, the military judge, over defense counsel's objection, allowed trial counsel to present Dr. MC's expert testimony regarding "counterintuitive behaviors of domestic violence victims." Trial defense counsel objected to this testimony because TA had already provided explanations for her actions. Appellant argues Dr. MC's testimony "served only as impermissible bolstering." Additionally, during sentencing, the military judge, over defense objections, permitted trial counsel to present expert testimony regarding post-traumatic stress disorder (PTSD) despite TA having never been diagnosed with or evaluated for PTSD.

### 1. Additional Background

#### a. Findings Testimony of Dr. MC

Immediately after Dr. MC was called to testify, trial defense counsel objected to Dr. MC's testimony under "[Mil. R. Evid.] 702." Trial defense counsel proceeded to advise the military judge that it was the Defense's understanding that Dr. MC

> will be testifying to reasons why people may stay in an abusive relationship generally. That type of testimony will not help the trier of fact understand the evidence in this case because throughout the [G]overnment's examination of [TA], they repeatedly asked her why she stayed, why did she make the statements she did, why did she continue to engage in behaviors she did. So, the court is already -- has the knowledge of why, in this case specifically, [TA] remained in -- the reason she gave for why she remained in the relationship. Having Dr. [MC] testify as to reasons why people generally may stay in abusive relationships doesn't help the trier of fact understand the particularized evidence in this case.

Trial counsel responded that Dr. MC would testify about the "psychological principles inherent in domestic violence victims and the complex and scientifically-based reasons why individuals stay in situations that most people would think, without his background, [are] counterintuitive." After hearing a brief argument from trial defense counsel, the military judge ruled, stating,

> Considering whether the subject matter of the proffered testimony will assist the factfinder and considering [Mil. R. Evid.]

702, I find that the [G]overnment is not limited to the evidence presented through the complaining witness. They are not limited to -- be unable to present corroborative or perhaps other evidence that would assist the factfinder in interpreting that testimony.

Further, I do find that the proffered expert testimony is appropriate under [Mil. R. Evid.] 702 and is likely to be of assistance to the factfinder in understanding complex and scientific evidence, which will -- may have to do with psychological or scientific reasons for such behavior. So, the defense objection on the -- whether the subject matter is appropriate for expert testimony is overruled.

There was no further objection regarding Dr. MC's credentials or qualifications as an expert in forensic psychology, nor did the defense object to his testimony on direct examination. After being qualified as an expert, Dr. MC testified about why victims of domestic violence stay or return to abusive relationships, specifically stating:

Probably the number one reason why abuse victims stay in those relationships is some sort of fear. Sometimes that fear is of retaliation. If I leave the relationship than [sic] he is going to hurt me in some way. The hurt isn't always physical. It's sometimes psychological, but there is some validity to that fear. Because the research has also shown that a woman is most at risk from an abusive relationship when she tries to get out of it.

Dr. MC provided other testimony regarding domestic violence and applied those principles to Appellant's case. During cross-examination, Dr. MC acknowledged he had not conducted an evaluation on TA, and came to his opinions based on his observations of her in an interview and based upon her trial testimony. Trial defense counsel challenged Dr. MC's opinion that TA's behavior was consistent with psychological principles behind behaviors of domestic abuse victims by asking him about numerous lies told by TA that were not necessarily counterintuitive victim behavior during this relationship. Trial defense counsel also postured research to Dr. MC that the "act of telling lies compromises a person's memory for the truth," a statement to which Dr. MC responded, "It can, yes."

### b. Sentencing Testimony

In sentencing, the Government first called TA as a witness. She testified about how Appellant's crimes impacted her. She stated she went from being a caring person to not trusting people. She stated that when she is in public places, she fears she will see Appellant. She noted she does not like people in

her personal space, which "triggers [her] to go back to that situation where [she] was in [her] house and [Appellant] was choking [her]." She added, "[I]f anybody startles me, it triggers one of these flashbacks" and agreed she is "easily started by little stimuli." She further testified that she believes she is paranoid; she checks her house, locks, windows, and outside the house multiple times a day. She said she has been painted as a liar and manipulator, and "people didn't believe [her]." She testified that she could only guess it would take months or years to get to a good place. TA also testified about how flashbacks she suffered would create physiological reactions:

> [I]t triggers a panic attack and it will give me shortness of breath, chest pain. I feel like I can't see, tunnel vision and when I come back to reality, it will feel like I'm still in danger. So, I'll have to leave a situation when these things happen to me.

Near the conclusion of its sentencing case, the Government recalled Dr. MC to testify. The military judge, over defense objections, allowed trial counsel to present expert testimony from Dr. MC regarding PTSD. Appellant argues there was no evidence that TA claimed to suffer from PTSD, or that she had ever been diagnosed with, treated for, or evaluated for PTSD.

Trial defense counsel argued that Dr. MC's testimony would not be "proper sentencing evidence under [R.C.M.] 1001," and "[b]ased on the [D]efense's understanding, wouldn't help the trier of fact, under [Mil. R. Evid.] 702." Trial counsel responded that Dr. MC would testify about "the diagnostic criteria of [PTSD]. The diagnostic criteria do fit very closely with what [TA] testified to all [sic] direct and it does help the trier of fact contextualize victim impact in this case as proper victim impact testimony under [R.C.M.] 1001(b)(4)."

The military judge initially ruled as follows:

> [T]he objection is overruled as far as being improper evidence in aggravation, as the court finds that it is relevant under [R.C.M.] 1001(b)(4) with regard to the psychological impact on the victim. Further, the court finds that the witness's testimony regarding the diagnostic criteria with regard to specific diagnosis -- diagnoses, would be helpful to the factfinder. So, the objection is overruled on the grounds of [R.C.M.] 1001(b)(4) and [Mil. R. Evid.] 702.

Dr. MC proceeded to testify about what causes PTSD and the symptoms; he then applied the facts of the case to the PTSD criteria, despite having never

evaluated or diagnosed TA.[15] He found in TA's testimony several categories of indicators for PTSD, including intrusive symptoms like nightmares and flashbacks, avoidance, change in mood and cognition, and hypervigilance.

Finally, when asked by trial counsel how long a treatment plan for PTSD would take, Dr. MC stated, "I would say no less than six months to a year, but certainly some patients ----," before his testimony was objected to for relevance by trial defense counsel. Trial counsel argued Dr. MC was making a "fact of consequence more or less likely in the sentencing phase of this court martial . . . [in that] [TA] is going to have a long and slow recovery from the crimes that she's been a victim of." Trial defense counsel stated, "I think the doctor had said he hadn't evaluated her and we don't know that she has any diagnosis. He's just talking about the process for someone to be treated for PTSD. We don't know that that's the case here and it's not relevant." The military judge allowed the testimony to "educate the court on what PTSD is and consequences."

Immediately before Dr. MC's cross-examination testimony, the military judge stated,

> Having heard the remainder of [Dr. MC's] testimony, considering the defense[']s previous objection, the court applies and [sic] [Mil. R. Evid.] 403 balancing test and, as the witness testified, [TA] has not been diagnosed, at least by the witness, with PTSD. So, with regard to the treatment, the court finds [Dr. MC's] testimony to have some probative value, albeit not particularly high. However, applying the [Mil. R. Evid.] 403 balancing test and comparing that probative value against the danger of unfair prejudice, the court is confident in its ability to place the testimony in its appropriate contexts [sic] and consider it for its proper purposes. The court will consider that testimony.

### 2. Law on Admissibility of Expert Testimony

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Erickson*, 76 M.J. 231, 234 (C.A.A.F. 2017) (citing *United States v. Olson*, 74 M.J. 132, 134 (C.A.A.F. 2015)). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344

---

[15] Dr. MC testified, "[W]e can kind of look at someone like [TA] and say, looks like that might be something appearing to be PTSD. But we do have a professional responsibility before we diagnose somebody to complete a full evaluation."

(C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

Mil. R. Evid. 702 governs the testimony of expert witnesses in a trial by court-martial. The rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Military judges serve as gatekeepers "tasked with ensuring that an expert's testimony both rests on a reliable foundation and is relevant." *United States v. Sanchez*, 65 M.J. 145, 149 (C.A.A.F. 2007) (*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)). "[T]he gatekeeping inquiry must be tied to the facts of a particular case." *Id.* (quoting *Kumho Tire Co.*, 526 U.S. at 150).

The United States Court of Appeals for the Armed Forces has articulated six factors to determine whether a proponent of expert testimony has met the Mil. R. Evid. 702 criteria:

> (1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of the evidence; (5) the reliability of the evidence; and (6) that the probative value of the expert's testimony outweighs the other considerations outlined in [Mil. R. Evid.] 403.

*United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)). Although *Houser* predates the leading Supreme Court decisions in this area—*Daubert* and *Kumho Tire Co.*—*Houser* is consistent with these decisions and continues to guide the admission of expert testimony in courts-martial. *Id.* (citations omitted). "[W]hile satisfying every *Daubert* or *Houser* factor is sufficient, it is not necessary." *Sanchez*, 65 M.J. at 149. The military judge's inquiry is "flexible" and "tied to the facts of a particular case." *Id.* (internal quotation marks and citations omitted).

**3. Analysis and Conclusion**

### a. Dr. MC's Findings Testimony

Appellant lodged a general challenge to the subject matter, basis, legal relevance, and reliability of Dr. MC's expert testimony. To preserve a claim of error in a ruling to admit evidence, a party must "state[ ] the specific ground, unless it was apparent from the context." Mil. R. Evid. 103(a)(1)(B). Among Appellant's contentions on appeal is that:

> Without citing to *Daubert*, relying upon any of the *Houser* factors, or hearing the expert's testimony, the military judge overruled the objection and reasoned that the Government was permitted "to present *corroborative* or perhaps other evidence that would assist the factfinder in interpreting that testimony."

Given that Appellant's broad allegations of error on appeal differ from the more limited objections lodged by counsel at trial, we must decide if Appellant forfeited his complaint about new grounds for exclusion. "A party *is* required to provide sufficient argument to make known to the military judge the basis of his objection and, where necessary to support an informed ruling, the theory behind the objection." *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005) (citing *United States v. Banker*, 60 M.J. 216 (C.A.A.F. 2004); *United States v. Brandell*, 35 M.J. 369, 372 (C.M.A. 1992)). "Where an appellant has not preserved an objection to evidence by making a timely objection, that error will be forfeited in the absence of plain error." *United States v. Brooks*, 64 M.J. 325, 328 (C.A.A.F. 2007) (citing Mil. R. Evid. 103(d)).

We conclude Appellant's specific objections at trial constitute forfeiture, if not waiver, of his more comprehensive challenge on appeal that the military judge failed to follow the *Daubert* or *Houser* framework that guides the admission of expert testimony in courts-martial. Appellant did not object on this basis; his objection was that expert testimony was not helpful to the factfinder or admissible under Mil. R. Evid. 702. Testing for plain error and finding none, we decline to grant relief. Dr. MC's testimony, couched in general terms about abusive relationships, was not obviously irrelevant or unreliable under the *Daubert* or *Houser* framework and did not reach any ultimate questions properly left for the military judge to decide.

Turning to Appellant's specific objections on findings that were preserved for review, Appellant argues that Dr. MC's testimony was used to corroborate and bolster TA's credibility "because after TA 'had clearly and directly testified to the' military judge regarding why she acted in the manner she did, Dr. MC 'provided additional testimony on the same point.'" Appellant further explains that the Government used Dr. MC's testimony to "impermissibly bolster TA's credibility by filtering her testimony through a far more credible witness." However, in sexual assault cases (an allegation with which Appellant was also

charged), expert testimony about what might be considered counterintuitive behavior of a victim has been allowed because it may assist factfinders in "disabusing themselves of widely held misconceptions." *United States v. Flesher*, 73 M.J. 303, 313 (C.A.A.F. 2014) (quoting *Houser*, 36 M.J. at 398) (internal quotation marks and additional citations omitted). Here too, Dr. MC's testimony could assist the military judge in understanding TA's actions related to the offenses of sexual assault, aggravated assault, and assault consummated by a battery, including why she did not immediately make a report to the police.

The military judge did not abuse his discretion in finding Dr. MC's expert testimony was helpful to the factfinder and we reject Appellant's contention that Dr. MC's testimony was irrelevant because it would not help the trier of fact. Mil. R. Evid. 702(d) was modified in 2004 based on an amendment to Federal Rule of Evidence (Fed. R. Evid.) 702, that was effective on 1 December 2000, making it identical to the Federal Rule. *See Manual for Courts-Martial, United States* (2016 ed.), App. 22, at A22-59. The Advisory Committee's note to the 2000 amendment to Fed. R. Evid. 702 allows "an expert to educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case." Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.[16] The record shows that TA described an abusive relationship for most of her time with Appellant. Dr. MC's testimony touched on several facts of consequence, including why victims of domestic violence either stay in, or return to, abusive relationships. He also outlined principles that explain counterintuitive behavior. Thus, Dr. MC's testimony was permissible. The defense strategy at trial counted on the factfinder believing a premise that was the opposite of Dr. MC's expert opinion: that TA had her own reasons for staying. Relying on this premise, Appellant took every opportunity to challenge TA's credibility and the truthfulness of her testimony, including highlighting numerous false statements she made throughout this case. We find that the probative value of the evidence outweighed the Mil. R. Evid. 403 considerations, and conclude the military judge did not abuse his discretion in admitting Dr. MC's expert testimony.

---

[16] The note explains that the amended Rule:

> does not alter the venerable practice of using expert testimony to educate the factfinder on general principles. For this kind of generalized testimony, Rule 702 simply requires that: (1) the expert be qualified; (2) the testimony address a subject matter on which the factfinder can be assisted by an expert; (3) the testimony be reliable; and (4) the testimony "fit" the facts of the case.

Fed. R. Evid. 702 advisory committee's notes to 2000 amendment.

### b. Dr. MC's Sentencing Testimony

We also find the military judge did not abuse his discretion by allowing Dr. MC to testify about PTSD. R.C.M. 1001(b)(4) allows trial counsel to present aggravating evidence relating or resulting from the offenses of which an accused has been found guilty, which would include evidence of a social and psychological impact. Although the record does not show that TA was diagnosed with PTSD, given her testimony, Dr. MC saw behaviors in her that tracked with PTSD, and explained those behaviors and how to treat them. Some of these behaviors included "heightened anxiety," "avoid[ing] situations that remind [her] of the traumatic offense," flashbacks, nightmares, and a change in arousal (in that "people with PTSD are often more hypersensitive and jumpy and nervous . . . than they used to be"). Dr. MC's testimony on these symptoms and behaviors, when coupled with TA's testimony, had some relevance. Furthermore, Dr. MC testimony was about the generalities of PTSD, as he recognized that, professionally, he could not diagnose TA.

Even if the military judge abused his discretion in allowing Dr. MC to testify on this issue, we find no prejudice. After Dr. MC's testimony, the military judge, noting that TA had not been diagnosed with PTSD, stated, "the court finds Dr. MC's testimony to have some probative value, albeit not particularly high." Taking into consideration that this was a trial by military judge sitting alone, Appellant has not shown prejudice and we do not find that this error "substantially influenced the adjudged sentence." *See United States v. Barker*, 77 M.J. 377, 384 (C.A.A.F. 2018) (quoting *United States v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009)). The testimony regarding PTSD added little to the Government's sentencing case in relation to the circumstances of the offenses and the victim impact testimony of TA.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d). Accordingly, the findings and sentence are **AFFIRMED**. The court's earlier opinion of *United States v. Webb*, No. ACM 39904, 2021 CCA LEXIS 432 (A.F. Ct. Crim. App. 12 Aug. 2021) (unpub. op.), is hereby withdrawn.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court